IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

GLOBAL ONE FINANCIAL,

    Plaintiff,

v.

EQUITABLE HOLDINGS, INC., *et al.*,

    Defendants.

Lead Case No.: 4:23-cv-164 (CDL)
Member Case No.: 4:24-cv-051 (CDL)

## SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, CROSSCLAIMS, AND THIRD-PARTY CLAIMS

Defendants Tejas Modi Irrevocable Trust, Pinali Modi as Trustee, Pinali Modi Irrevocable Trust, Tejas Modi as Trustee, Sadhana Patel Irrevocable Trust, Dinesh H. Patel as Trustee, Dinesh H. Patel Irrevocable Trust, Sadhana D. Patel as Trustee, Pinali Modi, Tejas Modi, Dinesh H. Patel, and Sadhana D. Patel (hereafter "Defendants"), by and through their undersigned counsel, hereby submit this Second Amended Answer to Plaintiff's Complaint (the "Complaint")[1] denying all allegations set forth in the Complaint not specifically admitted herein, and state as follows:

The First Amended Answer clarified and provided details as to allegations and added additional affirmative defenses based in part on the discovery that the collateral

---

[1] This is an amendment to the operative Answer filed in Member Case No. 4:24-cv-051 (CDL), which was consolidated with Lead Case No. 4:23-cv-164 (CDL)

1

assignments at the heart of this litigation are fraudulent and were knowingly advanced by Plaintiff as such when they concealed the assignment forms were invalid as they were neither in the name of the trusts nor signed by the trustees when the original complaint was filed (and never served on Patel Defendants). The declaration of Plaintiff's counsel and the original and amended complaint explicitly and falsely states that the trustees executed the assignments for the trusts.

These assignments bear the signatures of the Defendants in their individual capacity with no reference to the trusts that own the policies. Additionally, all notary certificates are phony.

Plaintiff, through its counsel and through his sworn declarations to this court misrepresented that the collateral assignments were executed by the trusts.

Additionally, Defendants have discovered the illegality of the loan terms, and the use of false notaries, concealed documents, Plaintiff's lack of license to make the loans, and violation of both New Jersey and Georgia law – rendering the loans void and unenforceable.

This Second Amended Answer, without waiving the venue and jurisdictional defenses expressed previously and hereinbelow, also adds counterclaims against Plaintiff, crossclaims against Equitable Holdings, Inc. ("Equitable")[2] with regard to claims which arise out of the transactions or occurrences that are the subject matter of the original action, arise out of the transactions or occurrences that are the subject matter of the

---

[2] Equitable is a co-party in Lead Case No. 4:23-cv-164 (CDL).

counterclaims asserted herein, or relate to property that is the subject matter of the original action, and joins third parties whose presence would facilitate determination of the counterclaims and crossclaims, pursuant to Fed. R. Civ. Proc., rules 13 and 20.

## I.    AS TO SUMMARY OF THE ACTION

1.    Defendants deny the allegation in Paragraph 1 of Plaintiff's Complaint, that "Global One routinely provides commercial loans to businesses or trusts to fund the purchase of annuity and life insurance products. These loans are then secured by, among other assets, security interests in and collateral assignments of the purchased policies and annuity contracts. This fact pattern generally summarizes Global One's relationship with Defendants." The loans are consumer loans based on the assets of individual consumer borrowers. Defendants deny the enforceability of the consumer loans cross default and cross-collateralization as the documents were concealed from Defendants and such guarantees and loan terms are unenforceable. Defendants lack personal knowledge sufficient to form a belief about the truth of the remaining allegations in Paragraph 1 and deny them on that basis.

## II.    AS TO PARTIES, JURISDICTION & VENUE

2.    Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the remaining averments embraced in Paragraph 2 of Plaintiff's Complaint and deny them on that basis.

3.    Defendants admit the allegations of Paragraph 3.

4.    Defendants admit the allegations of Paragraph 4.

5.    Defendants admit the allegations of Paragraph 5.

6.    Defendants admit the allegations of Paragraph 6.

7.    Defendants deny the allegations set forth in Paragraph 7.

8.    Defendants admit the allegations set forth in Paragraph 8.

9.    Defendants deny the allegations set forth in Paragraph 9.

10.    Defendants admit the allegations set forth in Paragraph 10.

11.    Defendants deny the allegations set forth in Paragraph 11.

12.    Defendants admit the allegations set forth in Paragraph 12.

13.    Defendants deny the allegations set forth in Paragraph 13.

14.    Defendants admit the allegations set forth in Paragraph 14.

15.    Defendants deny the allegations set forth in Paragraph 15. The allegations contained in Paragraph 15 of the Complaint constitute conclusions of law rather than averment of fact and, accordingly, no response is required. To the extent a response is required, Defendants deny those allegations and further respond as follows: Defendants were fraudulently induced into the contracts and deny jurisdiction as the documents were not presented to Defendants. Defendants were unaware of and did not consent to the agreement and there was no meeting of the minds. The loan documents were not provided to the Defendants before mid-2023 at the earliest for a loans allegedly made in 2020 and 2021. Plaintiffs concealed from Defendants its identity and location in the portion of the loan documents the Defendants saw. For example, the loan application (aka loan underwriting form "LUF") lists "GFD" and a logo for "G1" with "globalone" listed below. Omitted are the license number, legal name, phone number, address, and website. On information and belief, GFD stands for Global One Distributors, which is a

commission based, life insurance licensed sales organization and NOT a lender. GFD's

website states:

> GFD is the nation's leading provider of high-touch, customized life
> insurance premium financing and insurance-backed lending strategies and
> is a non-bank licensed insurance agency subsidiary of Synovus Bank.
> GFD's products and strategies are collectively marketed under the
> Leveraged Planning® solutions brand.

About Us - Global Financial Distributors (globalfd.com)
https://www.globalfd.com/about-us/

16.    The Defendants deny personal jurisdiction as they did not do business in

Georgia or execute any loan documents with Plaintiff. The loan was solicited by Plaintiff

in New Jersey through its authorized agent and all activities relating to the loan

solicitation, application, administration and any negotiation occurred between Plaintiff's

agent and Defendants in New Jersey, or unilaterally among Plaintiff's agent in New

York, where the agent resided and had an office.

17.    To the extent that any of the loan documents' signature pages contain the

Defendants' genuine signatures as written on those documents, the Defendants were not

permitted to read the documents, and Defendants deny that they were ever informed of

having to execute personal guarantees. Defendants' agents misled Plaintiffs by referring

to signature blocks on the blank LUF as "grantor" instead of "guarantor", such as in the

following e-mail to Defendants' daughter:

5

From: Chander Goel
To: Pinali Modi
Subject: LUF- Trust Borrower.pdf
Date: Tuesday, November 24, 2020 12:49:12 PM
Attachments: LUF- Trust Borrower.pdf
Untitled attachment 24913.htm

Hi Pinali,

Sorry to bother you but can you please have Sadhana ji sign at the bottom of page 1, where it says ***grantors*** signature and send it back to me. Thank you so much!!

18.    The Defendants deny that the personal guarantees are valid or genuine, and affirmatively state they never appeared before Plaintiff's and Equitable's New York agent/representative, Chander Goel's notary, Amina Razzaq.

19.    No documents providing for Georgia venue and/or jurisdiction were disclosed to or provided to the Defendants until this dispute arose.

20.    The Defendants deny personal jurisdiction as they did not do business in Georgia or execute any loan documents with Plaintiff. The loan was solicited by Plaintiff in New Jersey through its authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation occurred between Plaintiff's agent and Defendants in New Jersey, or unilaterally among the employees of Plaintiff's agent in New York, where the agent had offices.

21.    The loan documents were not provided to the Defendants before mid- 2023 at the earliest. To the extent that any of the loan documents' signature pages contain the Defendants' genuine signatures as written on those documents, the Defendants were not

6

permitted to read the documents, and Defendants deny that they were ever informed of having to execute personal guarantees.

22.    No documents providing for Georgia venue and/or jurisdiction were provided to the Defendants until this dispute arose.

23.    The Defendants deny that the personal guarantees are valid or genuine, and the Defendants deny that the personal guarantees are valid or genuine, and affirmatively state they never appeared before Plaintiff's and Equitable's New York agent/representative, Chander Goel's notary, Amina Razzaq. According to a 2023 lawsuit filed in New York, Amina Razzaq was a lender to Plaintiff's and the Equitable Defendants' agent who purportedly defaulted by failure, on August 22, 2019, to repay a debt of $323,375.00. Defendants should have but did not disclose these facts to the Defendants at any time.

24.    The allegations contained in Paragraph 16 of the Complaint constitute conclusions of law rather than averment of fact and, accordingly, no response is required. To the extent a response is required, Defendants deny those allegations and further respond as follows: Defendants were fraudulently induced into the contracts and deny jurisdiction as the documents were not presented to Defendants. Defendants were unaware of and did not consent to the agreement and there was no meeting of the minds. The loan documents were not provided to the Defendants before mid-2023 at the earliest for a loans allegedly made in 2020 and 2021.

25.    Plaintiffs concealed from Defendants its identity and location in the portion of the loan documents the Defendants saw. For example, the loan application (aka loan

underwriting form "LUF") lists "GFD" and a logo for "G1" with "globalone" listed below.

26.     Omitted are the license number, legal name, phone number, address, and website. On information and belief, GFD stands for Global One Distributors, which is a commission based, life insurance licensed sales organization and NOT a lender. GFD's website states:

> GFD is the nation's leading provider of high-touch, customized life insurance premium financing and insurance-backed lending strategies and is a non-bank licensed insurance agency subsidiary of Synovus Bank. GFD's products and strategies are collectively marketed under the Leveraged Planning® solutions brand.

About Us - Global Financial Distributors (globalfd.com)
https://www.globalfd.com/about-us/

**Trust Borrower Loan Underwriting Form**

Please complete and send to your GFD contact.

globalone

27.     The Defendants deny personal jurisdiction as they did not do business in Georgia or execute any loan documents with Plaintiff. The loan was solicited by Plaintiff in New Jersey through its authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation occurred between Plaintiff's agent and Defendants in New Jersey, or unilaterally among Plaintiff's agent in New York, where the agent resided and had an office.

28.     To the extent that any of the loan documents' signature pages contain the Defendants' genuine signatures as written on those documents, the Defendants were not permitted to read the documents, and Defendants deny that they were ever informed of

having to execute personal guarantees. Defendants' agents misled Plaintiffs by referring to signature blocks on the blank LUF as "grantor" instead of "guarantor", such as in the following e-mail to Defendants' daughter:

> From: Chander Goel
> To: Pinali Modi
> Subject: LUF- Trust Borrower.pdf
> Date: Tuesday, November 24, 2020 12:49:12 PM
> Attachments: LUF- Trust Borrower.pdf
> Untitled attachment 24913.htm
>
> Hi Pinali,
>
> Sorry to bother you but can you please have Sadhana ji sign at the bottom of page 1, where it says ***grantors*** signature and send it back to me. Thank you so much!!

29.     The Defendants deny that the personal guarantees are valid or genuine, and affirmatively state they never appeared before Plaintiff's and Equitable's New York agent/representative, Chander Goel's notary, Amina Razzaq.

30.     The allegations contained in Paragraph 16 of the Complaint constitute conclusions of law rather than averment of fact and, accordingly, no response is required. To the extent a response is required, the Defendants deny those allegations on the ground that they were fraudulently induced into the contracts and further deny jurisdiction as the documents were not presented to Defendants and there was no meeting of the minds.

31.     The Defendants deny personal jurisdiction as they did not do business in Georgia or execute any loan documents with Plaintiff. The loan was solicited by Plaintiff in New Jersey through its authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation occurred between Plaintiff's

9

agent and Defendants in New Jersey, or unilaterally among the employees of Plaintiff's agent in New York, where the agent had offices.

32. The loan documents were not provided to the Defendants before mid- 2023 at the earliest. To the extent that any of the loan documents' signature pages contain the Defendants' genuine signatures as written on those documents, the Defendants were not permitted to read the documents, and Defendants deny that they were ever informed of having to execute personal guarantees.

33. No documents providing for Georgia venue and/or jurisdiction were provided to the Defendants until this dispute arose.

34. The Defendants deny that the personal guarantees are valid or genuine, and the Defendants deny that the personal guarantees are valid or genuine, and affirmatively state they never appeared before Plaintiff's and Equitable' s New York agent/representative, Chander Goel's notary, Amina Razzaq. According to a 2023 lawsuit filed in New York, Amina Razzaq was a lender to Plaintiff's and the Equitable Defendants' agent who purportedly defaulted by failure, on August 22, 2019, to repay a debt of $323,375.00. Defendants should have but did not disclose these facts to the Defendants at any time.

35. No documents providing for Georgia venue and/or jurisdiction were disclosed to or provided to the Defendants until this dispute arose.

### III.   AS TO GENERAL ALLEGATIONS

### A.   Origination of the Notes and the Related Guaranties

#### 1.   Note 1

36.   Defendants deny the allegations set forth in Paragraph 17.

37.   Defendants deny the allegations set forth in Paragraph 18. The Document was concealed until shortly before this dispute arose.

38.   Defendants deny the allegations set forth in Paragraph 19.

39.   Defendants deny the allegations set forth in Paragraph 20.

40.   Defendants deny the allegations set forth in Paragraph 21.

41.   Defendants deny the allegations set forth in Paragraph 22. The Document was concealed until shortly before this dispute arose.

42.   Defendants respectfully refer the Court to the documents referenced in Paragraph 23 of the Complaint and deny the allegations set forth in Paragraph 23 of the Complaint to the extent that they are inconsistent therewith and to the extent the documents were concealed from Defendants, fabricated after the fact, or the subject of other malfeasance. The loan documents were not provided to the Defendants before mid-2023 at the earliest. Defendants deny that they were ever informed of having to execute personal guarantees and contend the personal guarantees not valid or genuine.

43.   The documents Plaintiff references are incomplete and omit other documents Plaintiff contends are part of the loan documents and that Plaintiff only recently provided to Defendants.

44. Defendants are otherwise without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 23 of Plaintiff's Complaint and deny them on that basis.

45. Defendants deny the allegations set forth in Paragraph 24.

46. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 25 and deny them on that basis.

### 2.   Note 2

47. Defendants deny the allegations set forth in Paragraph 26.

48. Defendants deny the allegations set forth in Paragraph 27.

49. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 28 and deny them on that basis.

50. Defendants deny the allegations set forth in Paragraph 29.

51. Defendants deny the allegations set forth in Paragraph 30.

52. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 31 and deny them on that basis.

53. Defendants respectfully refer the Court to the documents referenced in Paragraph 32 of the Complaint and deny the allegations set forth in Paragraph 32 of the Complaint to the extent that they are inconsistent therewith and to the extent the documents were concealed from Defendants, fabricated after the fact, or the subject of

other malfeasance. The loan documents were not provided to the Defendants before mid-2023 at the earliest. Defendants deny that they were ever informed of having to execute personal guarantees and contend the personal guarantees not valid or genuine.

54.    The documents Plaintiff references are incomplete and omit other documents Plaintiff contends are part of the loan documents and that Plaintiff only recently provided to Defendants.

55.    Defendants are otherwise without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 32 of Plaintiff's Complaint and deny them on that basis.

56.    Defendants deny the allegations set forth in Paragraph 33.

57.    Defendants deny the existence of any Trust Collateral Assignment, as none existed. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 34 and deny them on that basis.

**3.    Note 3**

58.    Defendants deny the allegations set forth in Paragraph 35.

59.    Defendants admit the allegations set forth in Paragraph 36.

60.    Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 37 of Plaintiff's Complaint and deny them on that basis.

13

61.     Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 38 of Plaintiff's Complaint and deny them on that basis.

62.     Defendants deny the allegations set forth in Paragraph 39.

63.     Defendants deny the allegations set forth in Paragraph 40.

64.     Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 41 and deny them on that basis.

65.     Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 42 of Plaintiff's Complaint and deny them on that basis. The loan documents were not provided to the Defendants before mid-2023 at the earliest.

66.     Defendants respectfully refer the Court to the documents referenced in Paragraph 42 of the Complaint and deny the allegations set forth in Paragraph 42 of the Complaint to the extent that they are inconsistent therewith and to the extent the documents were concealed from Defendants, fabricated after the fact, or the subject of other malfeasance.

67.     Defendants deny that they were ever informed of having to execute personal guarantees and contend the personal guarantees not valid or genuine. The documents Plaintiff references are incomplete and omit other documents Plaintiff contends are part of the loan documents and that Plaintiff only recently provided to the Defendants.

68.    Defendants deny those allegations on the ground that they were fraudulently induced into the contracts and further deny jurisdiction as the documents were not presented to Defendants and there was no meeting of the minds.

- The Defendants deny personal jurisdiction as they did not do business in Georgia or execute any loan documents with Plaintiff. The loan was solicited by Plaintiff in New Jersey through its authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation occurred between Plaintiff's agent and Defendants in New Jersey, or unilaterally among the employees of Plaintiff's agent in New York, where the agent had offices.

69.    The loan documents were not provided to the Defendants before mid- 2023 at the earliest. To the extent that any of the loan documents' signature pages contain the Defendants' genuine signatures as written on those documents, the Defendants were not permitted to read the documents, and Defendants deny that they were ever informed of having to execute personal guarantees.

70.    No documents providing for Georgia venue and/or jurisdiction were provided to the Defendants until this dispute arose.

71.    The Defendants deny that the personal guarantees are valid or genuine, and the Defendants deny that the personal guarantees are valid or genuine, and affirmatively state they never appeared before Plaintiff's and Equitable' s New York agent/representative, Chander Goel's notary, Amina Razzaq. According to a 2023 lawsuit filed in New York, Amina Razzaq was a lender to Plaintiff's and the Equitable Defendants' agent who purportedly defaulted by failure, on August 22, 2019, to repay a

debt of $323,375.00. Defendants should have but did not disclose these facts to the Defendants at any time.

72.    Defendants respectfully refer the Court to the documents referenced in Paragraph 43 of the Complaint and deny the allegations set forth in Paragraph 43 of the Complaint to the extent that they are inconsistent therewith and to the extent the documents were concealed from Defendants, fabricated after the fact, or the subject of other malfeasance. The loan documents were not provided to the Defendants before mid-2023 at the earliest. Defendants deny that they were ever informed of having to execute personal guarantees and contend the personal guarantees not valid or genuine. The documents Plaintiff references are incomplete and omit other documents Plaintiff contends are part of the loan documents and that Plaintiff only recently provided to Defendants.

73.    Defendants are otherwise without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 43 of Plaintiff's Complaint and deny them on that basis.

74.    Defendants deny those allegations on the ground that they were fraudulently induced into the contracts and further deny jurisdiction as the documents were not presented to Defendants and there was no meeting of the minds.

- The Defendants deny personal jurisdiction as they did not do business in Georgia or execute any loan documents with Plaintiff. The loan was solicited by Plaintiff in New Jersey through its authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation occurred

16

between Plaintiff's agent and Defendants in New Jersey, or unilaterally among the employees of Plaintiff's agent in New York, where the agent had offices.

75. The loan documents were not provided to the Defendants before mid- 2023 at the earliest. To the extent that any of the loan documents' signature pages contain the Defendants' genuine signatures as written on those documents, the Defendants were not permitted to read the documents, and Defendants deny that they were ever informed of having to execute personal guarantees.

76. No documents providing for Georgia venue and/or jurisdiction were provided to the Defendants until this dispute arose.

77. The Defendants deny that the personal guarantees are valid or genuine, and the Defendants deny that the personal guarantees are valid or genuine, and affirmatively state they never appeared before Plaintiff's and Equitable' s New York agent/representative, Chander Goel's notary, Amina Razzaq. According to a 2023 lawsuit filed in New York, Amina Razzaq was a lender to Plaintiff's and the Equitable Defendants' agent who purportedly defaulted by failure, on August 22, 2019, to repay a debt of $323,375.00. Defendants should have but did not disclose these facts to the Defendants at any time.

78. Defendants deny the allegations set forth in Paragraph 44.

79. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 45 of Plaintiff's Complaint and deny them on that basis.

### 4.    Note 4

80.    Defendants deny the allegations set forth in Paragraph 46.

81.    Defendants admit the allegations set forth in Paragraph 47.

82.    Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 48 of Plaintiff's Complaint and deny them on that basis.

83.    Defendants deny the allegations set forth in Paragraph 49.

84.    Defendants deny the allegations set forth in Paragraph 50 of Plaintiff's Complaint.

85.    Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 51 therein and denies them on that basis.

86.    Defendants respectfully refer the Court to the documents referenced in Paragraph 52 of the Complaint and deny the allegations set forth in Paragraph 52 of the Complaint to the extent that they are inconsistent therewith and to the extent the documents were concealed from Defendants, fabricated after the fact, or the subject of other malfeasance.

87.    Beyond that, the Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 52 of Plaintiff's Complaint, and deny them on that basis.

88.    The loan documents were not provided to the Defendants before mid- 2023 at the earliest. Defendants deny that they were ever informed of having to execute personal guarantees and contend the personal guarantees not valid or genuine.

89.    The documents Plaintiff references are incomplete and omit other documents Plaintiff contends are part of the loan documents and that Plaintiff only recently provided to Defendants.

90.    Defendants respectfully refer the Court to the documents referenced in Paragraph 53 of the Complaint and deny the allegations set forth in Paragraph 53 of the Complaint to the extent that they are inconsistent therewith and to the extent the documents were concealed from Defendants, fabricated after the fact, or the subject of other malfeasance. The loan documents were not provided to the Defendants before mid-2023 at the earliest. Defendants deny that they were ever informed of having to execute personal guarantees and the personal guarantees not valid or genuine.

91.    The documents Plaintiff references are incomplete and omit other documents Plaintiff contends are part of the loan documents and that Plaintiff only recently provided to Defendants.

92.    Beyond that, the Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 53 of Plaintiff's Complaint and deny them on that basis.

93.    Defendants deny the allegations set forth in Paragraph 54.

19

94.     Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments embraced in Paragraph 55 of Plaintiff's Complaint and deny them on that basis.

**B.     The Cross Default and Cross Collateralization Agreement**

95.     Defendants deny the allegations set forth in Paragraph 56. The allegations contained in Paragraph 56 of the Complaint constitute conclusions of law rather than averment of fact and, accordingly, no response is required. To the extent a response is required, Defendants deny those allegations and further respond as follows: Defendants deny the allegations set forth in Paragraph 56. The Document was concealed until shortly before this dispute arose. The allegations contained in Paragraph 56 of the Complaint constitute conclusions of law rather than averment of fact and, accordingly, no response is required. To the extent a response is required, Defendants deny those allegations and further respond as follows:

- Defendants were fraudulently induced into the contracts and deny jurisdiction as the documents were not presented to Defendants. Defendants were unaware of and did not consent to the agreement and there was no meeting of the minds. The loan documents were not provided to the Defendants before mid-2023 at the earliest for a loans allegedly made in 2020 and 2021.

96.     Plaintiffs concealed from Defendants its identity and location in the portion of the loan documents the Defendants saw. For example, the loan application (aka loan underwriting form "LUF") lists "GFD" and a logo for "G1" with "globalone" listed below.

97.     Omitted are the license number, legal name, phone number, address, and website. On information and belief, GFD stands for Global One Distributors, which is a commission based, life insurance licensed sales organization and NOT a lender. GFD's website states:

> GFD is the nation's leading provider of high-touch, customized life insurance premium financing and insurance-backed lending strategies and is a non-bank licensed insurance agency subsidiary of Synovus Bank. GFD's products and strategies are collectively marketed under the Leveraged Planning® solutions brand.

About Us - Global Financial Distributors (globalfd.com)
https://www.globalfd.com/about-us/

98.     The Defendants deny personal jurisdiction as they did not do business in Georgia or execute any loan documents with Plaintiff. The loan was solicited by Plaintiff in New Jersey through its authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation occurred between Plaintiff's agent and Defendants in New Jersey, or unilaterally among Plaintiff's agent in New York, where the agent resided and had an office.

99.     To the extent that any of the loan documents' signature pages contain the Defendants' genuine signatures as written on those documents, the Defendants were not permitted to read the documents, and Defendants deny that they were ever informed of having to execute personal guarantees. Defendants' agents misled Plaintiffs by referring to signature blocks on the blank LUF as "grantor" instead of "guarantor", such as in the following e-mail to Defendants' daughter:

> From: Chander Goel
> To: Pinali Modi

Subject: LUF- Trust Borrower.pdf
Date: Tuesday, November 24, 2020 12:49:12 PM
Attachments: LUF- Trust Borrower.pdf
Untitled attachment 24913.htm

Hi Pinali,

Sorry to bother you but can you please have Sadhana ji sign at the bottom of page 1, where it says ***grantors*** signature and send it back to me. Thank you so much!!

100.    The Defendants deny that the personal guarantees are valid or genuine, and affirmatively state they never appeared before Plaintiff's and Equitable's New York agent/representative, Chander Goel's notary, Amina Razzaq.

101.    No documents providing for Georgia venue and/or jurisdiction were disclosed to or provided to the Defendants until this dispute arose.

## AS TO COUNT I – BORROWERS BREACH OF CONTRACT UNDER THE NOTES

102.    Defendants hereby adopt and incorporate by reference its answers to Plaintiff's Complaint, Paragraphs 1 through 56 inclusive (paragraphs 1 through 101, above), as though same were fully set forth at length herein.

103.    Defendants state that the allegations contained in Paragraph 58 of the Complaint constitute conclusions of law rather than averment of fact and, accordingly, no response is required. Defendants expressly deny the allegations set forth in Paragraph 58 of the Complaint.

104.    Defendants deny the allegations set forth in Paragraph 59 of the Complaint.

105.    Defendants deny the allegations set forth in Paragraph 60 of the Complaint.

22

106. Defendants deny the allegations set forth in Paragraph 61 of the Complaint.

107. Defendants admit that a demand was sent. Otherwise, Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments set forth in Paragraph 62 and deny them on that basis.

108. Defendants admit that a demand was sent. Otherwise, Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the averments set forth in Paragraph 63 and deny them on that basis.

109. Defendants respectfully refer the Court to the documents referenced in Paragraph 64 of the Complaint and deny the allegations set forth in Paragraph 64 of the Complaint to the extent that they are inconsistent therewith.

110. Defendants respectfully refer the Court to the documents referenced in Paragraph 65 of the Complaint and deny the allegations set forth in Paragraph 65 of the Complaint to the extent that they are inconsistent therewith.

111. Defendants deny the allegations set forth in Paragraph 66 that they didn't respond and admit that the claimed "Deficiency Amounts" were not paid.

112. Defendants deny the allegations set forth in Paragraph 67 of the Complaint.

## AS TO COUNT II – THE MODIS' AND PATELS' BREACH OF CONTRACT UNDER THE GUARANTIES

113. Defendants hereby adopt and incorporate by reference, their answers to Plaintiff's Complaint, Paragraphs 1 through 67 inclusive (paragraphs 1 through 112, above), as though same were fully set forth at length herein. Defendants were fraudulently induced into the contracts and further deny jurisdiction as the documents

were not presented to Defendants. Defendants were unaware of and did not consent to the agreement and there was no meeting of the minds. The loan documents were not provided to the Defendants before mid-2023 at the earliest.

114.   Defendants deny the allegations set forth in Paragraph 69. No personal guarantees existed. The documents are fraudulent, never shown to Defendants and falsely notarized.

115.   Defendants deny the allegations set forth in Paragraph 70.

116.   Defendants deny the allegations set forth in Paragraph 71.

117.   Defendants deny the allegations set forth in Paragraph 72.

118.   Defendants deny the allegations set forth in Paragraph 73 that there are obligations.

119.   Defendants deny the allegations set forth in Paragraph 74.

### AS TO COUNT III – RECOVERY OF ATTORNEYS' FEES FROM BORROWERS

120.   Defendants hereby adopt and incorporate by reference their answers to Plaintiff's Complaint, Paragraphs 1 through 74 inclusive (paragraphs 1 through 119, above), as though same were fully set forth at length herein.

121.   Defendants deny the allegations set forth in Paragraph 76.

122.   Defendants deny the allegations set forth in Paragraph 77.

123.   Defendants admit that they did not remit payment and deny the balance of the allegations set forth in Paragraph 78.

124.   Defendants deny the allegations set forth in Paragraph 79.

### AS TO COUNT VI – RECOVERY OF ATTORNEYS' FEES FROM THE MODIS AND PATELS

125.  Defendants hereby adopt and incorporate by reference their answers to Plaintiff's Complaint, Paragraphs 1 through 79 inclusive (paragraphs 1 through 124, above), as though same were fully set forth at length herein.

126.  Defendants deny the allegations set forth in Paragraph 81.

127.  Defendants deny the allegations set forth in Paragraph 82.

128.  Defendants admit that they did not remit payment and deny the balance of the allegations set forth in Paragraph 83.

129.  Defendants deny the allegations set forth in Paragraph 84.

### RESERVATION OF RIGHTS

130.  No response needed as this is not an allegation of fact.

### AFFIRMATIVE DEFENSES

131.  Patel Defendants' foregoing responses to the allegations of the Amended Complaint are subject to the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by Plaintiff's fraudulent and intentional misrepresentations concerning the loan terms. Defendants were told by Plaintiffs' agents that the loans were a fixed rate in the 3% range. This was false.

Failure to Disclose Loan Information: Defendants allege that the Plaintiff failed to disclose necessary and pertinent information regarding the loan as required by law, thereby nullifying any claims against the Defendants. The interest rate, fees, terms and conditions were not explained or communicated to the Defendants.

25

The loan documents were not provided to the Defendants before mid-2023 at the earliest. Patel Defendants deny that they were ever informed of having to execute personal guarantees, they did not sign or knowingly sign and were not shown the documents and the personal guarantees are not valid or genuine.

## SECOND AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by Plaintiff's fraudulent and intentional concealment of the loan documents, its agent's discipline and loss of licenses occurring before the loans were funded, and use of false notarization.

## THIRD AFFIRMATIVE DEFENSE

The Court lacks subject matter over the dispute and personal jurisdiction over the Defendants, and venue is improper.

## FOURTH AFFIRMATIVE DEFENSE

Defendants allege that they were fraudulently induced into entering the contract. If a party was tricked, pressured, or misled into agreeing to the terms of the contract, the contract may be deemed invalid.

## FIFTH AFFIRMATIVE DEFENSE

The Contract alleged in the Complaint is unenforceable because it is procedurally and substantively unconscionable. The terms of the agreement are so one-sided and unfair that they shock the conscience and should not be enforced, including the prohibited pre-dispute waiver of jury (in violation of Georgia law); the requirement for a confession to judgment that would deprive Defendants of their ability to defend against the personal guarantee; and the imposition of pre-payment penalties on the entire potential line of credit even if not used.

## SIXTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the doctrines of waiver and/or estoppel.

26

## SEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by Plaintiff's breach of the implied covenant of good faith and fair dealing as to both Defendants and Equitable (claims reserved) for unlawful conversion of the policy cash values in direct violation of the policies at page 12, which reads:

### The Cash Surrender Value of this Policy

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge. The Cash Surrender Value during any policy month starting on a policy anniversary will not be less than it was on such anniversary after the deduction of monthly charges then due, assuming there are no partial withdrawals or other policy changes during that time.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any outstanding policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request, which must include the following:

1. A statement that you intend to surrender this policy;

2. This policy, or if this policy has been lost, stolen or destroyed, then a statement to that effect;

3. The name of the insured person and your name (if other than the insured person) and the address where proceeds should be mailed;

4. Your signature and the signature of a collateral assignee or other person having an interest in the policy as shown in our records.

As stated from the policies:

***In this policy:***
*"We,"* *"our"* and *"us"* mean Equitable Financial Life Insurance Company. *"You"* and *"your"* mean the owner of this policy.

The policy owners were always the Trusts (i.e., the "You and Your" as used in the policy). The assignment forms on which Plaintiff relies were not signed by the trustees in their capacity as trustees, and listed individuals as the owners.

The policy assignments are therefore invalid and were improperly submitted to Equitable and accepted by Equitable.

## EIGHTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the doctrine of "unclean hands."

27

## NINTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, for failing to state a claim for which relief can be granted.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Defendants acted in good faith and otherwise in accordance with established custom of consumer borrowers of a personal life insurance premium finance loan.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its lack of standing. Defendants allege that the Plaintiff lacks standing to bring forth this claim as it has not demonstrated sufficient connection to, or harm from the law or action challenged to support that Plaintiff's participation in the case.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred based on the illegality of its Contract. The contract violates Georgia and New Jersey lending and insurance laws, as well as federal lending and consumer protection laws. Plaintiff charges unlawful interest, loan origination charges, penalties, and other fees prohibited by law.

Plaintiff has also violated provisions of the Insurance Code, thereby invalidating its claim.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of ratification and/or release.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because they were asserted in an improper and/or incorrect forum.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own negligent conduct and comparative fault. Moreover, Plaintiff did not have a valid security interest in the life insurance policies since they violate the policy assignment provision – permitting only the policy owner the right to assign, and Plaintiff's assignments do not comply with the requirements of the Uniform Commercial Code (UCC) or the Insurance Law for creating and perfecting such an interest. Plaintiff did not have a proper assignment of the policies, a valid power of attorney, or a valid notice of interest filed with the insurance companies.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff failed to mitigate, obviate, diminish or otherwise lessen or reduce the injuries and/or damages alleged in the Complaint.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to punitive damages as it has failed to plead any facts which support a claim of willful conduct on the part of Defendants.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff lacked a premium finance lending license or other applicable required insurance and lending licenses in New Jersey as required.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff failed to make the minimum disclosures of loan terms and risks to Patel Defendants, in that Plaintiff failed to disclose necessary and pertinent information regarding the loan as required by law, thereby nullifying any claims against the Defendant.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by another action Plaintiff has brought against Defendants in which Plaintiff is seeking damages that include or subsume the damages sought in this case.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Defendants are entitled to possession of the funds described in the Complaint as the Outstanding Amount based on principles of civil offset, as Plaintiff owes an obligation to Defendants in excess of the Outstanding Amount.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Consideration has failed for any contract Plaintiff alleges Defendants breached.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's recovery for any claim for breach of contract is barred by Plaintiff's own breach of contract, which excuses performance by the Defendants.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of assumption of the risk.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's violation of the New Jersey Consumer Fraud Act which prohibits

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…, whether or not any person has in fact been misled, deceived or damaged thereby.

> Section 5(a) of the FTC Act, 15 U.S.C. 5 45(a), prohibits unfair or deceptive acts or

practices in or affecting commerce. Misrepresentations, or omissions of material fact necessary

30

to prevent misleading consumers, constitute deceptive acts or practices pursuant to Section 5(a) of the FTC Act.

Plaintiff represented through its agents that the premium finance loans to the Defendants were a fixed rate, when in fact they were variable rates.

## RESERVATION

Defendants expressly reserve the right to assert any additional affirmative defenses that may become apparent during the course of discovery or investigation, or as may otherwise be warranted.

**WHEREFORE**, Defendants deny that Plaintiff is entitled to any relief and demand judgment for dismissal of the Complaint, attorney fees, costs, and such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Defendants respectfully request a Jury Trial on all issues so triable.

## COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS

1.      Having answered Plaintiff's Complaint, and without waiving the venue and jurisdictional defenses raised in the foregoing Second Amended Answer, Defendants (hereafter referred to as "Cross-Complainants"), pursuant to Fed. R. Civ. Proc., rules 13 and 20, hereby state the following as their counterclaims against Plaintiffs, cross claims against co-Defendant Equitable,[3] and third-party claims (each such party, for ease of reference, is identified hereinafter as a "Cross-Defendant"):

---

[3] Equitable is a co-Defendant in Lead Case No. 4:23-cv-164 (CDL), but not in Member Case No. 4:24-cv-051 (CDL), but that case was consolidated with the Lead Case.

## I.    PARTIES

2.    Cross-Defendant Global One Financial, a division of Synovus Bank ("Global One"), is a state-chartered bank organized under the laws of the State of Georgia. Global One's principal place of business is located at 1200 Ashwood Parkway, Suite 150, Atlanta, Georgia 30338, and may be served with process by serving its registered agent for service of process, Deacon Service, LLC, 1111 Bay Avenue, 3rd Floor, Columbus, GA 31901. At all times relevant hereto, Cross-Defendants Goel and/or Zois was an authorized, actual, ostensible and apparent agent of and for Global One and performed all services and acted for Global One in New Jersey.

3.    Cross-Defendant Equitable Holdings, Inc. d/b/a Equitable Financial Insurance Company ("Equitable") is a corporation formed according to the laws of the state of Delaware and is a citizen of Delaware for jurisdictional purposes, and is also a citizen of New York, having its principal place of business at 1290 Avenue of the Americas, New York, NY 10104. Equitable may be served with process via its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware, 19808. At all times relevant hereto, Cross-Defendants Goel and/or Zois was an authorized, actual, ostensible and apparent agent of and for Equitable.

4.    Cross-Defendant Chander K. Goel was at all relevant times and, as of this filing, is a life insurance agent doing business in the State of New Jersey and New York. He may be served with process at his last known address of 14 Rose Lane, East Rockaway, NY 11518 or wherever Cross-Defendant may be found. Equitable appointed Goel as a New York "Life/Accident & Health Agent" from April 20, 2020, until his

32

termination on June 30, 2021. On information and belief, Goel is married to Cross-Defendant Stefania Zois. At all times relevant hereto, Goel was an actual agent of and for Cross-Defendants Global One and Equitable at all relevant times. On information and belief, Goel's appointment to Equitable was terminated before the policies were issued, So Equitable knowingly used Zois as a "straw man," as Goel had licensing problems and lawsuits that, on information and belief, prevented him from remaining "officially appointed" with the New Jersey and/or New York state departments of insurance.

5.  Cross-Defendant Stefania Zois was at all relevant times and, as of this filing, is a life insurance agent doing business in the State of New Jersey. She may be served with process at her last known address of 14 Rose Lane, East Rockaway, NY 11518 or wherever Cross-Defendant may be found. Equitable appointed Zois as a New York "Life/Accident & Health Agent" from October 6, 2021, until her termination on June 2, 2023. As of January 8, 2024, Zois' insurance license record for New York listed "her" email address as: c.goel@veludi.com. On information and belief, Zois is married to Cross-Defendant Goel. At all times relevant hereto, Cross-Defendant Zois was an agent of and for Cross-Defendants Global One and Equitable, and straw man for her husband, so she could receive commissions on business he improperly solicited and placed.

6.  Cross-Complainants are informed and believe, and thereon allege, that in committing the acts herein alleged, each Cross-Defendant was acting as the agent, servant and employee of every other Cross-Defendant, and was acting in the course and scope of such agency, service, or employment. Cross-Complainants are further informed and believe, and thereon allege, that Cross-Defendants, and each of them, authorized and

ratified the acts of every other Cross-Defendant.

## II.    FACTUAL BACKGROUND

7.    Cross-Complainants Dinesh Patel (aged 69) and Sadhana Patel (aged 64) are a retired married couple living in North Bergen, New Jersey.

8.    Cross-Complainants Tejas Modi (aged 42) and Pinali Modi (aged 41) are a married couple living in Avenel, New Jersey. Pinali Modi is the daughter of Cross-Complainants Dinesh Patel and Sadhana Patel.

9.    The Cross-Defendants are life insurance agents/agencies, a life insurance company, and a premium finance lender (which, on information and belief, was not licensed to provide consumer premium finance loans in New Jersey).

10.    In mid-July 2020, Cross-Complainants Dinesh Patel and Sadhana Patel (the "Patels") began to look into purchasing life insurance policies on their two grandchildren.

11.    In mid-August 2020, Goel visited the Patel's home to discuss life insurance policies as guaranteed and low-risk investments. When they spoke, Goel held himself out as having expertise in premium financing and Indexed Universal Life ("IUL") policies. At this meeting, Goel introduced them to Premium Financed Life Insurance ("PFLI") policies instead of traditional life insurance on their grandchildren, with the promise of providing financial security and leaving a legacy for their daughter, grandchildren, and future generations.

12.    Goel suggested they initially finance two IUL policies, one insuring Dinesh Patel and the other insuring his wife, Sadhana Patel. To the Patels, this was an entirely new concept outside their experiences as retirees, and they expressed concern the annual

34

premiums were unaffordable. Goel reiterated that premium financed IUL would be appropriate and promoted his scheme as an ideal solution as they would only pay interest on the premium finance loan, which was just a small fraction of the premiums.

13.    Through the end of 2020 and into 2021, Goel had numerous conversations and visits to the home of Dinesh and Sadhana Patel and additional communications with their daughter, Pinali Modi. In those exchanges, Goel summarized his scheme as follows:

   a.  First, Goel would act as the agent and sell Patel a Fidelity & Guaranty Life Insurance Company ("F&G") annuity, which would be used to show there were enough funds for collateral for the Global One loan. He suggested this annuity because, assuming high historical annuity returns continued, it would allow Patel to withdraw funds in the future with a high and safe profit as the annuity had a guarantee against principal loss.

   b.  Second, Goel would act as the agent and sell Patel a high-value IUL policy requiring ten years of premium payments.

   c.  Third, Goel would negotiate with Global One to finance all of the premium payments with a fixed, low-rate loan.

   d.  Fourth, Global One would capitalize loan interest payments at inception or shortly after that so that Patel would not need to make any cash payments towards the policy or the loan.

14.    In addition, Goel further described his scheme as having the following features and benefits:

   a.  The F&G annuity was safe from creditors' claims because it was for

35

retirement planning.

b.  Patel could withdraw funds from the F&G annuity for personal expenses in 6 to 7 years because it would have "excess money."

c.  The F&G annuity would grow tax deferred.

d.  The F&G annuity guaranteed that no loss of principal could happen and that the funds in the annuity would earn a positive rate tied to the stock market.

e.  Patel would need to create a trust to own the IUL policy.

f.  Goel could help Patel explore selling the policy in a future life settlement transaction, if Patel were interested in obtaining an enhanced value for it during his life.

15.  Since Goel repeatedly held himself out to the Patels as a highly skilled expert, they relied on his advice regarding life insurance, annuities, trusts, income taxes, retirement planning, creditor protection, and investments. Since the Patels had no experience or education in the complexities of IUL policies, Global One loans, or how the London Interbank Offered Rate (commonly called "LIBOR") operated, they justifiably relied on Goel's statements.

16.  The Patels requested Goel (an agent of Equitable and Global One) to secure the appropriate insurance for their particular situations, and therefore entrusted Equitable and Global One with control over a large portion of their finances. In doing so, the Patels relied upon Cross-Defendants to negotiate with multiple financial institutions, including Equitable, on their behalf.

36

17.     Goel represented to the Patels that they maintained a special relationship with Equitable. In fact, during conversations and written exchanges over text and email with the Patels, Goel boasted that he was "high profile" and there was "no need to worry, I'm here and will take care of everything." He further stated that underwriters typically don't speak with agents, but they do speak with him, making it clear the relationship with Equitable was well beyond the standard insurer-agent relationship.

18.     The Patels relied upon assurances from agents of Cross-Defendants that reputation Cross-Defendants', and the implied stamp of approval from Equitable and Global One's underwriters in purchasing the Patel Policies.

19.     Cross-Defendants used this reliance to harm the Patels in misappropriating almost $2.0 million of annuity and life insurance premiums, $26.0 million of insurance policy death benefits, and $9.28 million of collateralized Global One loans.

20.     The fraudulent scheme began to unravel in the summer of 2021 when Global One required additional collateral, a possibility never disclosed to Cross-Complainants.

21.     What followed can be seen in retrospect as months of misrepresentations designed to confuse Cross-Complainants and mask prior deceptions. Rather than promptly responding to requests for information, calls went unreturned, and text messages went unanswered. When Cross-Defendants occasionally provided information, it was either incomplete or inaccurate. Apologies multiplied, and figures were constantly revised.

22.     In December 2022, the Equitable policies were surrendered to mitigate

damages that had already led to significant financial losses.

23.    In the end, it's clear that Equitable consistently neglected its obligations by, among other things, failing to prevent or expose the fraudulent activities conducted by its own agents.

24.    Instead of safeguarding Cross-Complainants by discovering and ending the fraudulent scheme, Equitable and Global One actively participated and allowed it to persist, drawing in the Cross-Complainants, who were unaware that the underwriters were asleep at the switch or willfully disregarded it.

25.    Both Equitable and Global One bore a responsibility to Cross-Complainants, who depended on Equitable and Global One to prevent the dangers caused by their agents. Had Equitable and Global One followed established insurance and lending laws, common-sense practices and internal procedures in fulfilling its functions with even a minimum of care, Cross-Complainants would have been spared the financial ruin they face today.

26.    Importantly, for each of the documents identified herein:

    a.  To the extent the documents were actually signed, when executed, they were incomplete or blank application forms as controlled and directed by Cross-Defendant(s);

    b.  To the extent the documents were actually signed, when executed, Cross-Complainants were provided only with signature pages for signature; or

    c.  The signature of the Cross-Complainant appearing on the document is forged and was used and/or applied to the document without such Cross-

Complainant's knowledge and/or permission.

d. Even the "notarized" documents, are forgeries, as the notary in question (on information and belief, an employee or individual under Cross-Defendant Goel's control) did not witness the signatures, and "notarized" the documents outside such Cross-Complainant's presence and without such Cross-Complainant's knowledge or consent.

27. The various individual and entity Cross-Defendants each acted knowingly, willfully, and/or with conscious disregard or gross negligence when they:

a. Misrepresented the need, benefits, characteristics, and risks of the insurance and finance vehicles marketed and sold to Cross-Complainants;

b. Failed to provide available, customary and required product literature, disclosures, illustrations, loan documents, insurance policy documents, buyers' guides, illustrations, sales concepts brochures to Cross-Complainants;

c. Disregarded the inappropriateness of the insurance and finance vehicles when compared to Cross-Complainants' situation, goals and needs;

d. Disregarded the utter unsuitability of the insurance policies and/or loans, as they knew Cross-Complainants would not be able to afford the insurance and financing related to same, but that instead it was likely Cross-Complainants would suffer financial losses by purchasing the life insurance policies and loans – even property seizure and foreclosure;

e. Authorized Cross-Defendant Goel to represent them and transact business

as their agent with the public, including Cross-Complainants, and worked with Cross-Defendant Goel notwithstanding his numerous insurance customer and other complaints, his FINRA regulatory and former employer and customer action and complaints, and the numerous lawsuits in which he was a defendant;

f.  Chose to accept internally inconsistent, knowingly false and woefully incomplete documentation for the insurance policies and loans;

g.  Failed to obtain, inquire about, let alone attempt to verify essential suitability, eligibility and related material representations in the facially questionable applications, forms, illustrations, and supporting documentation for the life insurance policies and/or loans;

h.  Disregarded contradictory, inconsistent, missing and questionable basic, standard, essential, and required underwriting, financial, and personal information for Cross-Complainants' applications, forms and other documentation;

i.  Failed to perform proper (let alone reasonable) underwriting, or failed to adhere to required minimum underwriting industry standards applicable when issuing multi-million insurance policies and/or premium financing;

j.  Failed to inquire of the policy or loan applicant (the individual insured Cross-Complainants and/or the trustees of the Cross-Complainant trusts) as to missing information and documents, as well as about inconsistent statements and documentation provided in connection with the life

insurance policies, loan, and/or annuity policy;

k.  Worked as a joint venture and/or as a common enterprise with each of the other Cross-Defendants in a concerted effort to market and sell excessive, irrational, and fraudulent personal life insurance and premium financing to consumers who they knew would be unable to afford them; and

l.  Chose to keep Cross-Complainants in the dark and interact in nearly every regard only with Cross-Defendant Goel, and never separately confirmed with Cross-Complainants the information, facts, or their understanding of and/or participation in the process related to obtaining the life insurance policies and/or loan.

28.  As a result, erroneous, fraudulent, misrepresented, inappropriate, and even undisclosed/unauthorized policies and loans were issued. All of this was known (or should have been known) to the Cross-Defendants at the time.

### A.  Accepting and Failure to Investigate Application Inconsistencies

29.  Cross-Defendants' underwriters repeatedly overlooked apparent inconsistencies within the applications, willfully and wholly accepted the obvious misinformation, and failed to investigate in any manner, including but not limited to requesting clarification, correction by amendment or verification of available supporting evidence, third-party verification of income, assets, brokerage statements, financial statements, 1099s, W-2, additional premium finance or needs-based fact finding questionnaires, telephone interviews, and verified income tax transcripts commonly used during underwriting of loans and policies of the sizes at issue.

30.     All of the applications for Cross-Complainants' policies and loans contained numerous irregularities that required questioning and further examination. These inconsistencies would have alerted even the most inexperienced underwriter that further investigation was required. The underwriters missed numerous common red flags during underwriting that, had they adhered to industry norms, rules and regulations, and accurately and reasonably investigated these red flags, would have denied approval or issuance of the Cross-Complainants' policies and loans.

### 1.     Policy insuring Dinesh Patel

31.     No signed illustration was attached to this policy. Without a signed final illustration, the policy is issued against industry rules and market conduct regulation.

### a) Application Part 1:

32.     Page 1, question 12 stated he was "retired." However, this is inconsistent with additional information indicating he owned a business with $2,000,000 of equity. This red flag was ignored.

33.     Page 1, question 16 stated he had $0 earned income, $250,000 of gross unearned income, $400,000 of gross annual household income, and a total household net worth of $5,000,000. These are false figures used without the knowledge or consent of the Patel and Modi Cross-Plaintiffs by Cross-Defendants to "paper the deal" – making the file appear to justify the transactions.

34.     Page 1, question 18 omitted relevant information such as the full name, date, phone number, and email of the irrevocable trust owing this policy. Providing detailed beneficiary information is critical to ensure the policy proceeds are distributed

promptly and as requested. Here, contrary to industry norms, the policy owner wanted to keep their contact information private. This irregularity should have alerted the underwriter that further examination was required.

35.    Page 2, question 21 stated no life insurance policies or annuities were in force. This was inaccurate since Goel sold an F&G annuity to Dinesh Patel with an application date of January 15, 2021, weeks before these forms, which are dated February 3, 2021.

### b) Owner Questionnaire:

36.    Page 1, question 6 omitted the contact phone number for the trust policyowner. Again, this was a red flag.

37.    Page 3, question 28 listed the premium financing lender only as "Synovus Bank." The legal name of the lender is "Global One Financial, a division of Synovus Bank," as shown in documents.

38.    Page 3, questions 30 and 31 indicated "no" financial incentives such as cash payments and "free insurance" were discussed. These are both false statements.

### d) Financial Questionnaire:

39.    Page 1, questions 1 & 2 contained false statements.

40.    Page 1, question 3 stated "none" in disclosing how the policy face amount was determined and the formula used. This is a false statement in at least two instances. First, Goel used the Veludi Spreadsheets to summarize his scheme to the Cross-Complainants. Second, the question asked for the formula used to estimate the value of the business. The form showed a business equity value of $2,000,000. Some method must

have been used to estimate the value of the business equity. Accepting the answer as "none" for a proposed insured who has indicated he is "retired" but owned a business with an equity value of $2,000,000 is highly irregular and falls outside industry norms. This cried out for further investigation and to stop the improper transaction.

41.    Page 1, question 6 asked if any other person or entity would finance the policy. The answer is "no." This answer is false and goes to the heart of the negligence in this situation. A "yes" answer required copies of premium financing documents and a "detailed third-party prepared financial statement signed by the preparer." The question then asked why the premiums would be funded, the name of the lender, how the loan would be repaid, and if a personal guarantee was posted. There are no answers to these questions – just blank spaces.

42.    The answer to question 6 was in fact "yes," and the underwriter knew that from prior answers in the application. Why these answers were overlooked or brushed aside is unclear. Requesting a third-party financial statement signed by an independent party would have likely exposed the unsuitability of this transaction.

43.    Page 1, question 8 stated "no" trust will be the owner or beneficiary of this policy. This is clearly inaccurate, and the underwriters were on notice that the answer was "yes" from prior statements in the application. This fact also supports that the trusts were set up just for the policy investment and not as part of any legitimate planning.

44.    Page 1, question 9 asked if there had been any discussions regarding the sale of the policy. The answer provided was "no." However, Goel admitted during an August 2023 Zoom call that there were discussions.

### e) Signature page:

45.     Page D3 lacked electronic signature verification. Further, this page was signed by Zois as the agent, indicating that she had "witnessed the signature required on the fully completed Part 1." She further certified she "reviewed the application and questionnaires as they have been completed," attesting they were "true and complete." However, Goel admitted during a September 2023 video call that Zois "has no idea who these people [the Cross-Complainants] are."

46.     Moreover, all signed applications must indicate the actual location of the owner when the application was signed. Practices and procedures outline that, in general, the application should be signed in the state where the owner has a bona fide residence or employment, which may or may not be the same state where the policy was issued.

47.     Here, the signature page shows the city as "New York, NY" but lists the state as "NJ." This was highly unusual because this policy appears that it was issued as a New Jersey policy, the owner was a trust drafted under the laws of New Jersey, and Dinesh Patel was a retired resident of New Jersey. This policy has no substantive connection to the State of New York. Below is a portion of the signature block from this page:



**f) Life Remarks:**

48.     This page also lacked electronic signature verifications. Here, the document again declined to provide necessary contact information for the policyholder. As stated earlier, this was highly unusual and should have alerted the underwriter there was something unusual with this application that required further investigation.

**g) Amendment:**

49.     This page contained false updated financial information. Moreover, the presence of this document was unorthodox. The purpose of an amendment is to update information provided in the past, but this form was dated to match the application. Therefore, this amendment can't update prior details if it was dated the same day as the application.

**2.      Policy insuring Sadhana Patel**

50.     As with the prior policy insuring Dinesh Patel, there was no signed illustration with this policy, so the application is invalid.

**a) Application Part 1:**

51.     Page 1, question 12 stated she was "retired." However, as with her husband's application, this was contrary to other information in her application stating she owned a business with $2,000,000 of equity.

52.     Page 1, question 16 stated she had $0 earned income, $250,000 of gross unearned income, $400,000 of gross annual household income, and a total household net worth of $5,000,000.

53.     Page 1, question 18 omitted relevant information, such as the full name and

date of the irrevocable trust that owned this policy. This is highly unusual.

54.     Page 2, question 21 stated no life insurance or annuities were in force. This was false. Documents show Goel sold an F&G annuity to Sadhana Patel dated November 20, 2020, just three days before these forms dated November 23, 2020.

### b) Owner Questionnaire:

55.     Page 1, question 6 omitted the contact phone number for the trust policy owner. Again, highly irregular.

56.     Page 2, question 21 listed Christine Gough as the non-attorney who prepared the trust owning this policy. Documents reviewed indicate that Tess Leano, who worked with Pinali Modi, was the preparer.

57.     Page 2, question 26 stated this insurance was for "income replacement" and "estate planning" purposes. However, the application also stated she was retired. Since she was retired, thus not actively working and earning an income, "income replacement" was not a valid policy purpose and required further investigation. This inconsistency was not questioned by the underwriter.

58.     Page 3, question 28 listed the premium financing lender as "Global One." The premium financing documents showed "Global One Financial, a division of Synovus Bank," as the lender.

59.     Page 3, question 29 stated the source of funds used to purchase this insurance was "investment/savings" however, question 28 stated she intended to use loans to fund the policy and listed (inaccurately) the lender's name. This statement was another red flag that should have been researched. However, the underwriter failed to

question this issue.

60.    Page 3, questions 30 and 31 indicated "no" financial incentives such as cash payments or "free insurance" were offered to the insured. These are both false statements.

### d) Financial Questionnaire:

61.    Page 1, questions 1 & 2 contained false statements.

62.    Page 1, question 3 stated "none" in disclosing how the policy face amount was determined and the formula used. This is a false statement in at least two instances. First, Goel used the Veludi Spreadsheet to present his scheme to Cross-Complainants. Second, the question asked for the formula used to estimate the value of the business, and this form showed a business equity value of $2,000,000. Some method must have been used to determine the value of the business. Accepting the answer as "none" for a proposed insured who had indicated she was "retired" but owned a business valued at $2,000,000 was below the standard of care required.

63.    Page 1, question 5 regarding life settlements was unanswered. Typically, underwriters required an answer to this type of question because elderly insureds financing a high-value policies fit the profile of a STOLI transaction - a similar type of fraudulent scheme prevalent when the Cross-Complainants' policies were issued.

64.    Page 1, question 6 was also unanswered. It asked if the policy would be financed, and the answer was blank. A "no" answer would have been false. A "yes" answer required copies of the financing documents and a "detailed third-party prepared financial statement signed by the preparer." The question further asked why the

48

premiums would be borrowed, the name of the lender, how the loan would be repaid, and if a personal guarantee was posted. There are no answers to these questions – just blank spaces.

65.    We know the answer to question 6 was "yes," and the underwriter knew the answer was "yes" from prior application statements. As with the Dinesh Patel application, it is unclear as to why the answers were overlooked, waived, or ignored. Not requiring answers to these questions was highly unusual and contrary to industry procedures and practices.

66.    Page 1, question 8 was unanswered regarding whether a trust was the owner or beneficiary of this policy. As with question 6 above, the answer was "yes," and the underwriter was on notice the answer was "yes" from prior statements in the application.

67.    Page 1, question 9 asked if there has been any consideration of a sale of the policy. It was unanswered. Goel admitted to having these discussions before the policies were finalized.

### e) Signature page:

68.    Page D3 lacked electronic signature verification. Zois signed page D3 as the agent attesting that she had "witnessed the signature required on the fully completed Part 1." Goel admitted this was false during an August 2023 Zoom call.

69.    Moreover, all signed applications must indicate the actual location of the owner when the application was signed. Practices and procedures outline that the application should list the city and state where the signing occurs.

70.     Here, the signature page shows the state as "NJ" but contains only the letters "nb" for the city. This was highly unusual and unacceptable to ethical or compliant insurance companies. Below is a portion of the signature block:



### g) Amendments:

71.     As with policy insuring Dinesh Patel, amendments are meant to update or correct information provided in the past. Here, these amendments had a date matching the application date, so it can't update prior information if it is dated the same day as the application.

### 3.     Policy insuring Pinali Modi

72.     As with the two prior policies insuring her parents, the policy contained no signed final illustration, so this application is invalid.

### a) Application Part 1:

73.     Page 1, question 17 stated she had a $195,000 gross annual earned income, $0 gross unearned income, $350,000 gross annual household income, and a total household net worth of $7,000,000.

74.     Page 1, question 18 stated no life insurance policies or annuities were in force. This was a false statement. Goel sold an F&G annuity to Pinali Modi, issued on

March 15, 2021, almost three months before these forms dated June 10, 2021.

75.     Page 4, question 64 omitted relevant information such as the address, relationship to the proposed insured, phone number, and email for the irrevocable trust that owned this policy. Again, this was highly unusual and alerted the underwriter that further examination was needed.

76.     Page 6, question 77 listed the premium financing lender as "Global One bank." The premium financing documents listed "Global One Financial, a division of Synovus Bank," as the lender.

77.     Page 6, question 78 indicated the source of funds was "income," "investment/savings," and "loans." However, the question directly above stated she intended to finance the policy with loans and indicated (inaccurately) the lender's name. This inconsistency is another red flag, but the underwriter failed to question this issue.

78.     Page 6, questions 79 and 80 indicated "no" financial incentives such as cash payments or "free insurance" were discussed. These answers are false statements.

### b) Signature Page:

79.     This document lacked electronic signature verification. As with the prior policies, this document was signed by Zois, indicating she had "witnessed the signature required on the fully completed Part 1." Goel has admitted this was false.

### c) Life Remarks:

80.     This page lacked electronic signature verifications. The document again declined to provide the necessary contact information for the policyholder. Detailed beneficiary information was critically important, and refusing to provide that type of

51

information was highly unusual. Once again, the underwriter was alerted that something was not quite right but took no action to investigate further.

### d) IUL Investment Options Supplement:

81.     Page 1, section 1 regarding premium allocation instructions was unanswered. Not providing allocation instructions for the $200,000 annual premium was below the acceptable standard of care.

### e) Broker Transfer Authorization Form

82.     This page lacked electronic signature verifications. Page 1, section 1 inaccurately listed the owner of this policy as Tejas Modi in his individual capacity. However, the owner of this policy was the Pinali Modi Irrevocable Trust dated March 19, 2021, and the trust indicated both Tejas Modi and Sadhana Patel were trustees. Further, the required reference to Tejas acting as a trustee on behalf of the trust is missing. This section also omitted the policy number, which was known and included in other parts of this policy.

83.     Page 1, section 3 is the signature block. In contrast to the form's top section, this indicated Tejas Modi was signing as a trustee but omitted the signature of Sadhana Patel as co-trustee.

### f) Section C - Trust Owner Questionnaire and Certification for New Business:

84.     Page 1, question 1 omitted the full name, including the date of the irrevocable trust as the policy owner.

85.     Page 1, questions 4-8 omitted Sadhana Patel as co-trustee.

86.    Page 1, question 13 stated an attorney had prepared the trust documents. This was false. Documents indicated that Tess Leano, who worked with Pinali Modi as a non-attorney, was the preparer.

### g) Financial Questionnaire:

87.    Page 1, questions 1 & 2 contained false statements.

88.    Page 1, question 3 stated "none" regarding how the policy face amount was determined and the formula used. Goel used the Veludi Spreadsheet to summarize his detailed calculations to the Patels. Additionally, the question asked for the formula used regarding survivor needs. Since the stated purpose of this policy included "income replacement," which was a survivor need, underwriters commonly reviewed calculations used by the agent to determine the need - the application did not contain any of these calculations.

89.    Furthermore, the balance sheet listed an asset for $5,000,000 in the section for "other (please specify)." The only additional information provided about this asset was "trust." Underwriters typically requested additional information when a single asset comprises a large portion of the insured's net worth. Here, the $5,000,000 asset comprised over 66% of Pinali Modi's falsely stated $7,550,000 net worth but the underwriter failed to inquire let alone request additional document to confirm this facially specious valuation.

90.    Page 1, question 5 was unanswered.

91.    Page 1, question 6 was also unanswered. It first asked if any other person or entity would finance the policy. The answer is blank. A "no" answer was false and a

"yes" answer required copies of the financing documents along with a "detailed third-party prepared financial statement signed by the preparer." The question further inquired why the premiums were financed, the name of the lender, how the loan would be repaid, and if a personal guarantee was posted. These questions were not answered – just blank spaces. As we know, the answer to question 6 was "yes," which the underwriter knew from prior answers in the application. Gathering additional information would have likely exposed Goel's scheme, but the underwriter requested nothing. Why these answers were overlooked or waived is unclear if Equitable or Global One Financial were following industry practices and not willfully violating industry norms, market conduct standards and applicable insurance, financial and lending laws.

92.     Page 1, question 8 was unanswered if a trust was the owner or beneficiary. As with question 6 above, the answer to the question was "yes," and the underwriter was on notice that the answer was "yes" from prior answers in the application.

93.     Page 1, question 9 asked if there had been any consideration of a sale of the policy. It was unanswered. Goel admitted to having these discussions before finalizing any of the Patel Policies.

### i) Supplement Form for Electronic Delivery:

94.     This page lacked electronic signature verifications.

95.     Page 1, section 1 inaccurately listed the owner as Tejas Modi in his individual capacity. The owner of this policy was the Pinali Modi Irrevocable Trust dated March 19, 2021, and the trust document indicated both Tejas Modi and Sadhana Patel were trustees. Further, there was no reference to Tejas acting as a trustee on behalf of the

trust. This section also omitted the policy number, which was known and included in other parts of this policy.

96.    Page 1, section 3 contains the signature block. In contrast to the form's top section, this indicated Tejas Modi was signing as a trustee but omitted the signature of Sadhana Patel as co-trustee.

### j) Life Remarks:

97.    This page lacked electronic signature verifications. As seen earlier, the document declined to provide the necessary contact information for the policyholder. Again, this was highly unusual and alerted the underwriter that something was wrong.

### k) Amendment:

98.    Amendments are meant to update prior or missing information, but this amendment was dated the same day as the application it was amending. It is not clear what purpose this amendment served if the application were genuine (and not an updated, sanitized, altered document created to "paper" the file).

### 4.    Policy insuring Tejas Modi

99.    This policy contained no signed final illustration so, as with all prior files, the application was invalid.

### a) Application Part 1:

100.    Page 1, question 16 stated he had $190,000 gross annual earned income, $0 gross unearned income, $350,000 gross annual household income, and a total household net worth of $5,200,000.

101.    Page 1, question 18 omitted the drafted date, phone number, tax

identification number, and email for the irrevocable trust that owned this policy. As mentioned with regard to the prior policies, this pattern is highly unusual and alerted the underwriter that something was wrong requiring further investigation. The underwriter did not take any action to follow up on this irregularity. If Equitable or Global One Financial were following industry practices and not willfully violating industry norms, market conduct standards and applicable insurance, financial and lending laws, they would have done so.

102.    Page 2, question 21 stated there were no pending life insurance policies or in-force annuities. We know this was false, and there was a pattern with these false statements. Goel sold an F&G annuity to Tejas Modi almost two months before these forms, dated 5-10-2021. Additionally, Goel had applied to Ameritas for a policy insuring Tejas Modi with a death benefit of $4,500,000, and Goel concealed this fact on the application.

### b) Broker Transfer Authorization Form:

103.    This page lacked electronic signature verifications.

104.    Page 1, section 1 inaccurately listed the owner of this policy as Pinali Modi in her individual capacity. The owner of this policy was the Tejas Modi Irrevocable Trust dated March 19, 2021, and the trust document indicated both Pinali Modi and Sadhana Patel were trustees. This section also omitted the policy number, which was known and included in other parts of this policy.

105.    Page 1, section 3 is the signature block. In contrast to the top section of the form, this indicated that Pinali Modi was signing as a trustee but omitted the signature of

Sadhana Patel as co-trustee.

### c) Owner Questionnaire:

106.    Page 1, questions 2, 5, and 6 omitted essential contact information regarding the trust policy owner. As repeatedly stated, missing important contact information is concerning and put the underwriter on notice that further inquiry was required.

107.    Page 1, question 7 omitted Sadhana Patel as a co-trustee.

108.    Page 2, question 18 inaccurately listed the grantor as the "Tejas Modi Irr Trust."

109.    Page 2, question 19 omitted Sadhana Patel as a co-trustee.

110.    Page 2, question 21 stated Patel used an attorney to prepare the trust. Documents indicated that Tess Leano, who worked with Pinali Modi as a non-attorney, was the preparer.

111.    Page 3, question 28 listed the premium financing lender as "Global One." The premium financing documents listed "Global One Financial, a division of Synovus Bank," as the lender.

112.    Page 3, question 29 indicated the premium funding source was "income" however, question 28 directly above stated the policy would be financed and listed (inaccurately) the lender's name. This inconsistency was a red flag and required further attention from the underwriter. The underwriter failed to question this issue.

113.    Page 3, questions 30 and 31 indicated "no" financial incentives such as cash payments or "free insurance" were offered to the insured. These are false statements.

**e) Financial Questionnaire:**

114.    Page 1 omitted the policy number found in other parts of the application.

115.    Page 1, questions 1 & 2 contained false statements.

116.    Page 1, question 3 stated "none" in disclosing how the policy face amount was determined and the formula used. This was false because Goel used the Veludi Spreadsheets to present his scheme to the Patels, including Tejas Modi. Additionally, the question asked for the formula used to calculate the survivor need. Since the stated purpose of this policy included "income replacement," underwriters commonly requested to review the calculations used, but there is no evidence that occurred.

117.    Furthermore, the balance sheet listed an asset for $3,000,000 in the section for "other (please specify)." The only additional information provided about this asset was "trust." Since this $3,000,000 asset comprises approximately 54% of his stated $5,550,000 net worth, underwriters regularly ask to confirm this value with additional information. There is no indication that it occurred.

118.    Page 1, question 5 was unanswered.

119.    Page 1, question 6 was also unanswered. It first asked if the policy would be financed, and the answer was blank. If this question had been answered "no," it would have been a false statement. If this question had been answered, "yes," copies of the financing documents and a "detailed third-party prepared financial statement signed by the preparer" were required. The question asked why the premiums were being financed, the name of the lender, how the loan would be repaid, and if a personal guarantee would be posted. There are no written answers to these questions – just blank spaces. We know

the answer to question 6 was “yes,” and the underwriter knew that from prior answers in the application. It is unclear why these answers were overlooked or waived. Furthermore, a third-party financial statement signed by the preparer would have exposed this fraudulent transaction. An ethical life insurer underwriter lender was duty-bound to stop the improper transaction.

120. Page 1, question 8 is unanswered regarding whether a trust was the owner or beneficiary of this policy. As with question 6 above, the answer to the question was “yes,” and the underwriter was on notice that the answer was “yes” from prior statements in the application, had the application been legitimate. On information and belief, the application is a composite document with portion cobbled together at different times to “paper the deal”, rather than being a legitimate completed application with attendant forms.

121. Page 1, question 9 asked if there had been any discussions regarding a sale of the policy. It is unanswered. Goel admits to having these discussions before finalizing the Policies.

**f) Signature page:**

122. Page D3 lacked electronic signature verification. This page indicated Pinali Modi was signing as a trustee but omitted the signature of Sadhana Patel as co-trustee.

123. This page was signed by Zois as the agent, indicating that she had “witnessed the signature required on the fully completed Part 1,” but Goel has admitted during the August 2023 Zoom call that Zois did not witness the signatures as she attested.

**g) Life Remarks:**

124.    This page lacked electronic signature verifications. The document further declined to provide customary contact and tax identification information. Once again, it was highly unusual that a $5,000,000 life insurance policy owner would not want to provide complete contact information. This red flag should have alerted the underwriter that this application required further review.

**h) Amendments:**

125.    The first amendment corrected the false statements regarding the Ameritas policy concealed on the application, and the second amendment corrected the omission regarding the type of product selected. As stated prior, the purpose of any amendment is to update information provided in the past, but this form had a date matching the application date. It is unclear how this amendment updated prior information if it was dated the same day as the application. If the application were genuine (and not an updated, sanitized, altered document to paper the file), this amendment makes no sense.

126.    These types of omissions are red flags often used to obscure details that could reveal inconsistencies or hinder the detection of false statements. Identifying and addressing these intentionally omitted sections is crucial for ensuring transparency and integrity in financial reporting and preventing fraudulent practices.

**B.    Failure to Investigate Financial Discrepancies**

127.    Underwriters must confirm that the proposed policy's purpose, annual premium, and death benefit are reasonable, affordable, and in line with industry procedures and practices. Industry researchers have found the most common charge

against fraudulent insurance agents is that they overstated the insured's annual income and net worth to deceive and mislead underwriters into issuing policies they should have declined. Goel stated during a September 2023 video call that he would occasionally "fluff" numbers "here and there" sometimes inflating the net worth of a proposed insured by one-third and increasing their annual income by 50%.

128.    Cross-Complainants all submitted their true and correct income tax returns and information to Equitable and Global One Financial through the institutions' agents and/or employees. There is no excuse for the approval of the loans or policies under these circumstances (receipt of applications with inflated financials).

129.    Here, the underwriters reviewed numerous financial inconsistencies within applications for the Cross-Complainants' policies yet approved them without regard to that knowledge. The underwriters could have obtained additional information, including 1099s, W-2s, tax transcripts setting forth the insured's actual income before issuing the policies, and if acceptable, amended the policy to reflect their true income. However, that never occurred.

### 1.    Financial Inconsistencies: Policy insuring Sadhana Patel

130.    On November 20, 2020, Sadhana Patel provided Goel with detailed financial information as part of the application for her F&G annuity. Those forms estimated her annual household income (combined with her spouse) to be $132,000 after income taxes and estimated her net worth at $3,500,000. Equitable would not have seen these forms; however, Goel certainly did, as he was the agent for those F&G annuities. Goel admitted during the September 2023 video call that he was "being creative" when

he overstated Sadhana Patel's net worth on the F&G annuity forms by at least $700,000 "just for approval purposes."

131.    After providing fraudulent financial information to F&G Insurance Company, Goel then provided it to Equitable to underwrite Cross-Complainants' policies. Here is a comparison of the financial information in the F&G annuity forms, the forms found in the policy insuring Sadhana Patel, and Sadhana Patel's joint 2019 income tax return:

|  | Application within Equitable Policy dated 12-8-20 | Financial Questionnaire within Equitable Policy dated 12-8-20 | 2019 Joint Income Tax Return | F&G Annuity Forms dated 11-20-2020 |
|---|---|---|---|---|
| Annual Personal Unearned Income | $250,000 | $244,000 | -- |  |
| Annual Household Income | $400,000 | -- | $152,951 AGI | $132,000 after-tax |
| Net Worth | $5,000,000 | $5,600,000 | -- | $3,500,000 |

132.    Not only is there a wide range of values for the same categories, but the figures shown on your Cross-Defendants' own forms don't even match. Underwriting could have easily discovered this discrepancy by requesting a copy of the insured's recent tax returns, obtaining a tax transcript from the Internal Revenue Service, or ordering an inspection letter, as many other insurers do regularly. The underwriter's reliance was unreasonable since in several other places on the application the information conflicted with prior answers.

### 2.    Financial Inconsistencies: Policy Insuring Dinesh Patel

133.    On February 17, 2021, Equitable issued a policy insuring the life of Dinesh

Patel, whom Equitable had been underwriting since September 2020, using figures identical to the inconsistent figures above regarding his wife. For this policy, the underwriter required an additional amendment to be signed at delivery confirming the prior fraudulent information that went unnoticed when issued the policy insuring Sadhana Patel. Here is a breakdown of those figures from his policy and application.

| | Application within Equitable Policy dated 2-17-21 | Financial Questionnaire within Equitable Policy dated 2-17-21 | Amendment within Equitable Policy dated 2-17-21 | 2019 Joint Income Tax Return | F&G Annuity Forms dated 11-20-2020 |
|---|---|---|---|---|---|
| Annual Personal Unearned Income | $250,000 | $244,000 | $244,000 | -- | |
| Annual Household Income | $400,000 | -- | | $152,951 AGI | $132,000 after-tax |
| Net Worth | $5,000,000 | $5,600,000 | $5,600,000 | -- | $3,500,000 |

### 3. Financial Inconsistencies: Dinesh and Sadhana Patel Joint Finances

### a) Personal versus Household Income

134. When comparing the applications for Dinesh and Sadhana Patel, both stated individual unearned income of either $250,000 or $244,000 and combined household income of $400,000. However, if Dinesh Patel had $244,000 of income and Sadhana had another $244,000 of income, the combined household income was $488,000, not the $400,000 shown on the form. The underwriters failed to notice and further investigate this inconsistency.

### b) Occupation versus Income and Net Worth

135.    In each of the policies insuring Dinesh and Sadhana Patel, the same balance sheet listed a business asset with equity of $2,000,000; however, both Dinesh and Sadhana showed no earned income in the current year or the prior year. Here is a portion of the balance sheet from the policy insuring Sadhana.

136.    Though possible, it is highly doubtful that a business owner with $2,000,000 of equity in an operating business would show zero earned income for two consecutive years. At the very least, this was highly suspicious, and any reasonable underwriter would have requested more information to confirm – especially when answers indicated the insured was "retired." Indeed, Goel remarked upon seeing this during the September 2023 video call "he [Dinesh Patel] was retired, there was no business."

137.    Here is a portion of the final application from the policy insuring Dinesh Patel showing his retirement status:

ON A-PROPOSED INSURED INFORMATION                                    Application for Ind

Plan Name BRIGHTLIFE GROW, SERIES 159 _____ Face Amount $4,000,000.00

1. Name  First _____Dinesh_____ Middle _____ Last _patel_

2. SSN _ _____

4. Is the Proposed Insured the Owner?   ☐Yes  ☒No (If "No," complete Owner Questionnaire or see Survivorship A

5. Primary residential address 7306 Dane Court _____ Bldg/Apt

City/Municipality North Bergen _____ County/Parish* _____ Sta

*County/Parish only required in AL

6. Are you a U.S. citizen?   ☒Yes ☐No  (If "No," complete Foreign Residence and Travel Question

7a. Phone # (201) 868-8649 _____ ☒Daytime ☐Cell ☐Evening   b. Best time to ca

8. Date of birth _ _____ (mm/dd/yyyy)  9. Place of birth _ _____

10. Email address dpatel1955@gmail.com _____

11. Do you have a driver's license?   ☒Yes ☐No   If "Yes," provide license number, state and expira

Number _ _____ State NJ _____ Expiration Date 01/02/2024

If no driver's license, do you have a government issued ID?   ☐Yes ☐No

If "Yes" to government issued ID, type of ID _____ Government ID

12. Currently employed?   ☐Yes ☐No ☒Retired ☐Other _____
If "Yes," to question 12, complete questions 13-15

13. Current occupation(s) a. Title _____ b. Years a

138. The underwriters could have easily obtained true information from another source prior to issuing this policy, however, documents indicate that did not occur here. The underwriters should have noticed the occurrence of financial inconsistencies multiple times on numerous documents.

139. First, the financial inconsistencies should have been caught and investigated further when underwriting the policy that insured Sadhana Patel in December 2020.

140. Second, two months later, in February 2021, the identical financial inconsistencies should have been caught when underwriting the policy insuring Dinesh Patel.

141. As mentioned above, the underwriters could have easily requested recent

tax returns, obtained tax transcripts, or required inspection letters to confirm or deny the suspicious financial information provided by Cross-Defendants Goel and/or Zois. Getting third-party verification of information was a widespread practice in the insurance industry at the time and underwriters must make independent investigations to confirm information provided on applications. The underwriters were negligent in not doing so.

### 4.   Financial Inconsistencies: Policy insuring Pinali Modi

142.   On December 1, 2020, Pinali Modi spoke with Goel about her finances and sent a follow-up email providing more details. Here is a portion of her email to Goel:

> Hey Chander,
>
> Per our telephone call earlier here is the breakdown of what my husband and I have:
>
> $450k in 401k
> $200k in stocks
> $250k cash (including CD)
> Bought House for $520 still owe $250
> Also, our income is $170k yearly
>
> Sent from my iPhone

143.   This information indicated her annual household income was approximately $170,000, and her combined net worth with her husband was roughly $1,170,000. In addition to this email, Pinali Modi sent an email to Goel on April 15, 2021, attaching 18 documents showing proof of these values and providing her joint tax returns for 2018 and 2019. Goel was well-informed about the financial situation of Pinali Modi and submitted financial information to your underwriters, which they presumably reviewed and used to issue a policy insuring Pinali Modi dated June 17, 2021.

144. It is unclear who precisely orchestrated these fraudulent financial statements, but when Goel was asked about these financial inconsistencies, he responded that Choudhury

> … would handle all the underwriting, all the entering applications, all the conversation with the premium financing team. Because it's not just what you apply, it's what needs to be approved from the company also.

145. It's plain to see that information shown in the application and related forms is materially and vastly different than the information Pinali Modi provided to Goel on two separate occasions. Below is a comparison of the financial information emailed to Goel, the forms found in your issued policy insuring Pinali Modi, and her joint 2019 income tax return:

|  | Email to Goel dated 12-1-2020 | Application within Equitable Policy dated 6-17-21 | Financial Questionnaire within Equitable Policy dated 6-17-21 | 2019 Joint Income Tax Return |
|---|---|---|---|---|
| Annual Personal Earned Income | -- | $195,000 | $195,000 | -- |
| Annual Household Income | $170,000 | $350,000 | -- | $142,795 AGI |
| Net Worth | $1,170,000 | $7,000,000 | $7,550,000 | -- |

146. As shown above, the figures shown on the forms for this policy don't even match.

### 5. Financial Inconsistencies: Policy insuring Tejas Modi

147. Just a few days before issuing a policy on Pinali Modi, on June 11, 2021, Equitable issued a separate policy insuring her husband, Tejas Modi, using additional

fraudulent financial information. Here is a comparison of the financial information provided to Goel, the forms in the policy insuring Tejas Modi, and his joint 2019 income tax return:

|  | Email to Goel dated 12-1-2020 | Application within Equitable Policy dated 6-11-21 | Financial Questionnaire within Equitable Policy dated 6-11-21 | 2019 Joint Income Tax Return |
|---|---|---|---|---|
| Annual Personal Earned Income | -- | $190,000 | $190,000 | -- |
| Annual Household Income | $170,000 | $350,000 | -- | $142,795 AGI |
| Net Worth | $1,170,000 | $5,200,000 | $5,550,000 | -- |

**6.    Financial Inconsistencies: Pinali and Tejas Modi Joint Finances**

**a) Personal versus Household Income**

148.    When comparing the applications for Pinali and Tejas Modi, Pinali indicated her income was $195,000 and Tejas stated his income was $190,000. Both applications indicated they had a combined household income of $350,000. However, if Pinali Modi had $195,000 of income and Tejas had another $190,000 of income, the combined household income was $385,000, not the $350,000 shown on the form. Yet the underwriters failed to notice and further investigate this inconsistency.

**b) Net Worth**

149.    When comparing the net worth figures for Pinali Modi to her husband Tejas Modi, there is a discrepancy of over $2,000,000. It is unclear how this was overlooked when both policies were underwritten simultaneously and submitted by the same agent.

The underwriter could have compared one file to the other to discover something was wrong. Absent that simplistic approach, the underwriter could have requested a copy of the insured's recent tax returns, obtained a tax transcript from the Internal Revenue Service, or ordered an inspection letter to confirm or deny the questionable financial information. Equitable's underwriters inexplicably chose to take none of those actions and were blind to this inconsistency.

### 7. Financial Inconsistencies: Net Worths Were Overstated

150. Equitable illustrations and internal guidelines stated an insured must have a minimum net worth of $5,000,000 to finance premiums.

151. Equitable's agents knew of this requirement and likely inflated the net worth figures for each of the Cross-Complainants so they could qualify for premium financing. Goel admitted he was "being creative" when he overstated Sadhana Patel's net worth on the F&G annuity forms by at least $700,000 "just for approval purposes." When questioned further about these inflated balance sheets, Goel responded that Choudhury would just "take care of it."

152. As indicated earlier, the insurance industry and most life insurance companies have erected safeguards and protocols since the early 2000s to detect and reject applications containing these types of inconsistencies before approval, but Cross-Defendants' underwriters failed to investigate these questionable statements.

### C. Failure to Follow Internal Guidelines

### 1. Patel Policy Premiums Were Unaffordable

153. In addition to examining the insured's income and net worth, underwriters

determine if the policy premiums are affordable assuming all premiums are paid in cash with personal funds. Borrowed funds are not included in this analysis.

154.    Affordability is determined by first examining the insured's gross income then comparing that figure with the premiums shown in the policy illustration. Underwriters will also examine industry standards and internal guidelines in reaching their final decision. Under industry standard procedures and practices, annual premiums typically cannot exceed 25% of the insured's gross income.

### a) Policy Insuring Dinesh Patel

155.    The joint annual gross income shown for both Dinesh and Sadhana Patel in 2019 was $152,951. Allocating this amount equally to each spouse results in an annual income of $76,476 for Dinesh. In contrast, the application amendment for this policy indicated his yearly income was $244,000. The annual premium on this policy was $250,000.

156.    Therefore, the maximum annual premium, using the true income from his tax return and industry-standard guidelines was $19,119 per year. In contrast, the maximum annual premium using his overstated income shown on the policy amendment and industry-standard guidelines was $61,000.

157.    In the end, the final policy premium for Dinesh Patel was at least $189,000 greater (and most likely $230,881 greater) per year than the maximum allowed under industry guidelines.

### a) Policy Insuring Sadhana Patel

158.    As with Dinesh, allocating their joint income equally to each spouse results

in an annual income of $76,476 for Sadhana. In contrast, the application amendment for this policy indicated her yearly income was $244,000.

159.    The maximum annual premium, using the true income from her tax return income and industry-standard guidelines was $19,119. In contrast, the maximum annual premium using her overstated income shown on the policy amendment and industry-standard guidelines was $61,000. The annual premium on this policy was $350,000.

160.    In the end, the final policy premium for Sadhana Patel was at least $289,000 greater (and most likely $330,891 greater) per year than the maximum allowed under industry guidelines.

### b) Policy Insuring Pinali Modi

161.    The joint annual gross income shown for both Pinali and Tejas Modi in 2019 was $142,795. Allocating this amount equally to each spouse results in an annual income of $71,397 for Pinali. In contrast, the application amendment for this policy indicated her yearly income was $195,000. The annual premium on this policy was $200,000.

162.    Therefore, the maximum annual premium, using the true income from her tax return and industry-standard guidelines was $17,849 per year. In contrast, the maximum annual premium using her overstated income shown on the policy amendment and industry-standard guidelines was $48,750.

163.    In the end, the final policy premium for Pinali Modi was at least $151,250 greater (and most likely $182,151 greater) per year than the maximum allowed under industry guidelines.

### a)    Policy Insuring Tejas Modi

164.    Allocating half of their joint income to Tejas results in an annual income of $71,397 for him. In contrast, the application amendment for this policy indicated his yearly income was $190,000. The annual premium on this policy was $125,000

165.    Therefore, the maximum annual premium, using the true income from his tax return and industry-standard guidelines was $17,849 per year. In contrast, the maximum annual premium using his overstated income shown on the policy amendment and industry-standard guidelines was $47,500.

166.    In the end, the final policy premium for Tejas Modi was at least $77,500 greater (and most likely $107,151 greater) per year than the maximum allowed under industry guidelines.

167.    The Patel Policies were clearly unaffordable for the Patels on a cash basis and would have consumed their savings in just a few short years. Goel knew these premiums were unaffordable, suggesting the Patels borrow all premiums and the estimated future interest payments instead. The underwriters also knew, or by exercising ordinary diligence, could have discovered these premiums were clearly unaffordable.

### 2.    Patel Policy Death Benefits Were Excessive

168.    Underwriters are also required to determine if the death benefit is appropriate for the policy's applied for purpose. Since death benefits are intended to provide a safety net - not a windfall - to the beneficiary, the amount of death benefit is limited.

169.    Death benefit limitations are determined by examining the insured's annual

income and comparing that figure with age of the insured at the time of underwriting. Underwriters use industry standards and internal guidelines in reaching their final decision.

### a) Policy Insuring Dinesh Patel

170. The joint annual gross income shown for both Dinesh and Sadhana Patel in their 2019 tax return was $152,951. Allocating this amount equally to each spouse results in a "true income" of $76,476 for Dinesh. In contrast, the application amendment showed his inflated income was $244,000 (his "inflated income"). Dinesh Patel was age 66 when the policy was issued, and Equitable's internal underwriting guidelines call for the maximum death benefit at his age to be no more than 10 times his annual income. The death benefit approved and issued on this policy was $4,000,000.

171. Under Equitable's own internal guidelines, the maximum death benefit using his true income was $764,760. In contrast, the maximum death benefit using his inflated income was $2,440,000.

172. Using his true income, Equitable approved and issued a policy that had a death benefit that was $3,235,240 greater than allowed by their own internal guidelines. Using his inflated income, Equitable still violated its own guidelines by issuing a policy with a death benefit $1,560,000 greater than allowed. Equitable failed to follow internal and industry guidelines in both scenarios.

### b) Policy Insuring Sadhana Patel

173. Allocating half of their joint income to Sadhana results in $76,476 of "true income" for her. In contrast, the application amendment listed her inflated income at

$244,000. She was age 60 when the policy was issued, and Equitable's internal underwriting guidelines call for the maximum death benefit at her age to be no more than 15 times her annual income. The death benefit on this policy was $8,000,000.

174.    Under Equitable's own internal guidelines, the maximum death benefit using her true income was $1,147,140 but the maximum death benefit using her inflated income was $3,660,000.

175.    Using her true income, Equitable approved and issued a policy that had a death benefit that was $6,852,860 greater than allowed by their own internal guidelines. Using her inflated income, Equitable still violated its own guidelines by issuing a policy with a death benefit $4,340,000 greater than allowed. Equitable again failed to follow internal and industry guidelines in issuing this policy.

### c) Policy Insuring Pinali Modi

176.    The joint annual gross income shown for both Pinali and Tejas Modi in their 2019 tax return was $142,795. Allocating this amount equally to each spouse results in a "true income" of $71,398 for Pinali. In contrast, the application amendment showed an "inflated income" of $195,000. She was age 39 when the policy was issued, and Equitable's internal underwriting guidelines call for the maximum death benefit at his age to be no more than 30 times her annual income. The death benefit approved and issued on this policy was $9,000,000.

177.    Under Equitable's own internal guidelines, the maximum death benefit using her true income was $2,141,940. In contrast, the maximum death benefit using her inflated income was $5,850,000.

74

178.    Using her true income, Equitable approved and issued a policy that had a death benefit that was $6,858,060 greater than allowed by their own internal guidelines. Using her inflated income, Equitable still violated its own guidelines by issuing a policy with a death benefit $3,150,000 greater than allowed. Equitable failed to follow internal and industry guidelines in both scenarios.

### d) Policy Insuring Tejas Modi

179.    Allocating half of their total joint income to Tejas results in an annual income of $71,398 for him. In contrast, the application amendment inflated his yearly income to $190,000. He was age 39 when the policy was issued, and Equitable's own internal guidelines call for the maximum death benefit at his age to be no more than 30 times his annual income. The death benefit on this policy was $5,000,000.

180.    Under Equitable's own internal guidelines, the maximum death benefit using his true income was $2,141,940. In contrast, the maximum death benefit using his inflated income was $5,700,000.

181.    Using his true income, Equitable approved and issued a policy that had a death benefit that was $2,858,060 greater than allowed by their own internal guidelines. Using his inflated income, the policy approved and issued by Equitable was (surprisingly) $700,000 under the maximum allowed.

### D.    Failure to Deliver Required Documents and Disclosures

182.    Procedures and practices require various documents, including a complete copy of the policy and a signed illustration, to be delivered by the time of policy delivery.

183.    Here, Equitable and its agents were aware of these requirements but failed

to perform them. Indeed, Goel had recently finalized F&G annuities for the Patels and documents show he delivered many of the very same documents just weeks before completing the Patel Policies.

184.    Documents show Equitable did not deliver, on multiple occasions, state-mandated basic illustrations, nor did they provide required policy documents and disclosures. When questioned by Cross-Complainants about these missing documents, Goel and/or Zois made false misrepresentations and hid prior deceptions which caused Cross-Complainants to part with more of the money they had spent a lifetime accumulating.

### 1.    Policy and Application

185.    A copy of the policy must be delivered within a reasonable time so purchasers can read and be aware of its contents. A copy of the application is also incorporated into and attached to the policy. Physical delivery of the policy is required. Agents cannot merely obtain a signed receipt confirming delivery then retain or discard the policy. Mandatory delivery is meant to protect against deception and concealment by fraudulent individuals like Goel and Zois, who inserted numerous false statements and signatures into policy documents.

186.    Here, there are no signed receipts confirming the policy, application, and related disclosures had been delivered. Without proper delivery, Cross-Complainants had no way of knowing Equitable's agents had inserted incorrect information into the applications. This failure prevented Cross-Complainants from examining and discovering the fraudulent misstatements and alterations within Cross-Complainants policies and

76

related applications.

### a) Free Look Period

187.    Most, if not all, states mandate a "free-look" period of at least ten days after physical policy delivery, allowing for a full review to make a final informed decision without financial risks. The free-look period begins on the date of policy delivery, so it's critical for agents to explain the details of this provision fully.

188.    Here, Cross-Complainants were deprived of a free-look period because Equitable's agents failed to deliver Cross-Complainants' policies properly. This prevented Cross-Complainants from understanding they could cancel within a period of time and receive a full refund.

### 2.    Illustration

189.    A copy of the final signed illustration used to issue the policy must also be provided no later than the time of delivery. This is important because illustrations demonstrate how guaranteed and non-guaranteed elements of a policy may perform over time, preventing purchasers from being misled. Indeed, Equitable's premium financing form highlights the importance of the requirement:

> **1. UNDERSTAND YOUR LIFE INSURANCE ILLUSTRATION(S).** The application for life insurance is not valid without a signed, complete Equitable Financial Life Insurance Company or Equitable Financial Life Insurance Company of America ("EFLOA") basic life insurance policy illustration. This basic illustration is presented to the proposed policyowner and reflects guaranteed elements and non-guaranteed elements. Non-guaranteed elements are subject to change by the insurer. Review this basic illustration closely. In particular, if you anticipate taking loans and withdrawals from your policy to repay the premium financing arrangement, it is important to understand the various factors that might affect the anticipated borrowing. The illustration discusses certain factors that impact policy performance, including taking loans and withdrawals, policy lapse, as well as the potential tax implications of assigning a modified endowment contract.

190.    Here, Cross-Complainants did not receive copies of any signed illustrations at the time of delivery, and none of the documents reviewed contained copies of the final

signed life insurance illustrations. These final signed illustrations were necessary for Cross-Complainants to be able to rely upon statements made by Equitable' agents as to the content contained within those final illustrations. The documents that were received were altered/incomplete – critically depriving the Cross-Complainants of basic, mandatory disclosures and information that would have disabused them of the false and fraudulent integrated premium finance life insurance transaction.

### 3. Buyer's Guide

191. Industry guidelines also require a Buyer's Guide to be delivered with the policy or prior to its' delivery.

192. Here, the documents reviewed did not contain a Buyer's Guide as required for each of Cross-Complainants' policies. A Buyer's Guide provides unbiased information about life insurance and helps policy purchasers determine if their policy is appropriate for their needs. Cross-Complainants were deprived of any opportunity to review a Buyer's Guide.

### 4. Policy Summary

193. A policy summary document must also be delivered along with the policy by the time of policy delivery. This document typically includes contact information for the insurance company and specific policy information, including the type of policy, policy rider features, death benefit schedules, annual premiums, and policy surrender value provisions.

194. Here, the documents did not include policy summaries for any of Cross-Complainants' policies as required.

### 5.    Premium Financing Disclosures

195.    Depending on circumstances, additional disclosure documents are required to be provided before a policy is finalized. These documents increase transparency, further allowing potential purchasers to make informed decisions.

196.    No premium financing disclosures were provided for the policies insuring Sadhana Patel, Pinali Modi, and Tejas Modi. While there was a premium financing disclosure form for the policy insuring Dinesh Patel, this form was signed and dated just one day before the issued date shown on the policy. And, as outlined earlier, this document appears to have been altered. Even if genuine, providing this disclosure just one day before finalizing the policy was unreasonable by not providing adequate time for review.

### E.    Failure to Provide Adequate Time for Review

197.    Similar to the required free look period mentioned above, potential insureds and policy owners must be provided with sufficient time to review copies of documents and consult with others before signing and finalizing a policy purchase.

198.    Here, many of the required documents and disclosures are missing, while other documents appear to have been finalized at the last minute, preventing adequate time for review and consideration. It was unreasonable to expect Cross-Complainants to comprehend the intricacies of a life insurance contract and other complex documents, all prepared by Equitable, if not given ample time to review them.

### F.    Failure to Secure Electronic Transmissions

### 1.    Disclosure and consent

199.    Disclosure and consent must be granted for electronic document transmission and signature collection. These disclosures and consents do not appear to exist for the policies insuring Dinesh Patel, Sadana Patel, Pinali Modi, and Tejas Modi.

### 2.    Electronic Signatures

200.    The federal ESIGN law, effective October 1, 2000, requires electric signatures to be verified on legal documents. To comply with the ESIGN law, financial services companies like Equitable commonly use DocuSign to collect and verify signatures on legal documents. Their software places a unique document envelope ID number on the upper left corner of each page when certifying a verified signature.

201.    Here, many documents reviewed in this matter lack the "DocuSign Envelope ID" verification number in the upper left corner. This omission calls into question if the signatures were electronically verified by Equitable as required by law.

202.    Further, the signatures on documents reviewed for each of Cross-Complainants policies are just minutes apart from each other. Moreover, Cross-Complainants do not recall receiving any electronic signature links to sign these documents. Below is an example from the policy insuring Tejas Pinali (allegedly claiming that she read and signed the multi-page dense application just 1 minute and 25 seconds after opening it). This is another red flag that went ignored.



203.    In summary, repeatedly, Equitable failed to deliver critical documents as required by law, including the required policy illustrations, state-mandated disclosure documents, and the policies themselves. Equitable's improper actions prevented Cross-Complainants from making an informed decision.

### 3.    Personal Identifiable Information

204.    The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires documents with personally identifiable information, such as life insurance policies and applications, to be sent securely over email using encryption and password protection.

205.    Here, Choudhury ignored these safeguards on March 17, 2021, when he sent an unprotected PDF copy of the policy insuring Dinesh to Pinali Modi. These documents contained Dinesh Patel's date of birth, social security number, driver's license number, medical history, and financial information. Here is a portion of his email:

81



### G.  Failures in Fraud Prevention

206.   Insurance companies are required to comply with fraud prevention, detection and reporting guidelines as required by law and standard industry practices. Increased scrutiny acts as a deterrent to fraudulent agents knowing their applications will be closely examined during underwriting. Insurers who choose to operate below these standards are targeted for fraud.

207.   In preventing fraud, policies are subjected to various reviews, audits, and verifications before being issued as well as after issue. No documentation appear to exist that any of the following techniques were used to combat fraud regarding Cross-Complainants' policies.

### 1.  Pre Policy Issue

#### a) Cover Letters

208.   There are no cover letters for any of Cross-Complainants' policies. Cover letters are customarily required for all premium finance policies like Cross-Complainants' policies, and agents write them to provide transparency, clarify unique situations, or give the underwriters additional information about the pending insured, policy owners, or overall transaction.

209. Here, the absence of cover letters was highly unusual for high-value policies having annual premiums in the hundreds of thousands of dollars - even more so when complex premium financing loans were the stated funding method. This is concerning, as agents who fail to provide detailed cover letters or avoid providing sufficient financial documentation may be hiding critical details from the underwriter.

### b) High-Risk Review

210. In addition to normal underwriting reviews, high-value IUL policies funded with premium financing are typically subject to a secondary more heightened review by a separate team or by experienced underwriters because they scrutinized information more diligently than inexperienced underwriters. There is no evidence that occurred here.

### 2. Post Policy Issue

### a) Failure to Audit

211. Most insurers have established special investigation units to help identify and investigate suspicious underwriting activity and agents suspected of fraudulent sales practices. These units regularly perform proactive internal audits of high-value life insurance policies, like the Patel Policies, and the high-producing agents that sell them, like Equitable's agents, before the two-year contestability period expires to uncover fraudulent schemes they may have missed initially during underwriting.

212. In summary, there is no evidence of heightened underwriting reviews, special investigations, or post-issue policy audits concerning Cross-Complainants' policies. Cross-Complainants relied upon Equitable to abide by all practices and procedures to combat insurance fraud and would not have made a financial commitment

to purchase Cross-Complainants' policies if they had known of Equitable's non-compliance in this area.

213.   Cross-Complainants' annual income and net worth bore no relation to the annual premiums or death benefits for Cross-Complainants' policies. At the very least, the financial information contained within the Cross-Complainants' policies was suspicious, and the underwriters had a duty to investigate further. The common underwriting process at most insurance companies contains multiple checks and balances to verify the accuracy of application statements while encouraging underwriters to independently confirm suspicious information if needed. The underwriters had knowledge that many of Cross-Complainants' policy application statements differed from previous statements within the same document, putting them on notice that something was amiss. Any reasonable underwriter would have declined to issue Cross-Complainants' policies or inquired further into these inconsistencies before finalizing their review. That did not occur here.

## III.   POLICY SERVICE MISCONDUCT

214.   After issuing policies, insurers are required to provide ongoing policy service and assistance to policyholders. Policyholders have paid for these continuing services in the form of agent commissions included in the annual premiums. There were multiple shortfalls in this area.

### A.   Failure to Provide Accurate Information

215.   Statements and notices are required to be delivered promptly upon policy changes, but no less than annually, and must contain relevant and accurate information.

216.    Here, Equitable failed to notify Cross-Complainants regarding important changes to their policy records, including collateral assignments, pending policy lapses, and, more importantly, agent changes for the policy. This failure deprived Cross-Complainants of important policy information and the benefit of their paid-for services.

217.    First, policy statements omitted any information regarding the collateral assignment and contact information for the collateral assignee, even though it's common in the industry for this information to appear after those documents are finalized. This issue is relevant to Cross-Claimants allegations concerning the fatally flawed/ineffective, fake and fraudulently advanced collateral assignment forms claimed by Equitable and Global One, and specifically falsely attested to by counsel for Global One.

218.    Second, though Goel's agent appointment with Equitable had been terminated by the Summer of 2020 and Zois' appointment with Equitable was terminated in July 2021, and again in June 2023, there were no notices informing Cross-Complainants of these concerning events.

219.    Third, notices omitted information normally present in paperwork generated by an insurance company. Below is a portion of a notice dated July 7, 2021, just a few days before Zois' first termination, that was sent to Cross-Complainants regarding the policy insuring Pinali Modi. It omitted Mustaque Choudhury's last name at the bottom of the letter:

Sincerely,

Policy Service

cc: Financial Professional - Stefania Zois @ MNB
    Pinali Modi Irrevocable Trust
    Mustaque

**Enclosures:**
    • i/Endorsed Assignment Request

220.    Further, when Zois was no longer shown as the financial professional (synonymous with "writing agent"), notices instead listed the generic "Service CRM New York Metro" as the financial professional. Through no fault of their own, the Patels had effectively been orphaned as policyholders. A later notice sent just a few days after Zois' second termination in June 2023, failed to provide any contact information for a licensed agent. During a recorded telephone call, Equitable informed Pinali Modi and her life insurance expert Steven Roth that Ms. Zois was terminated for improper sales practices, and that she owed the company a lot of money in commission chargebacks for bad policies on which she received commissions.

221.    Cross-Complainants desired, contracted for, and indeed paid for – via six-figure agent commissions – the services of an individual agent who could regularly meet with them in person to provide specific advice and ongoing assistance regarding $26,000,000 of life insurance coverage. Instead, Equitable ignored this duty, providing Cross-Complainants with only a toll-free service desk number in a national call center. Whether due to corporate cost-cutting measures or negligence, Equitable deprived Cross-Complainants of the ability to be informed policy owners.

### B.    Failure to Complete Documents

222.    Incomplete documents can be unreliable or incorrect leading to processing errors. Leaving sections blank or unsigned can be particularly concerning in situations where accuracy and completeness are crucial, such as in financial transactions or legal documents. Because incomplete documents provide partial or misleading information, they raise concerns regarding fraud. Within the financial services industry, forms that

omit required information, are undated, or are unsigned are typically considered incomplete documents and unable to be processed.

223.    Here, finalized copies of documents provided to Cross-Complainants were incomplete or lacked required signatures. Below is an example of a page from the collateral assignment placed on the policy insuring Pinali Modi in July 2021. Though Equitable did acknowledge the assignment had been placed on the policy using their own letterhead, they did not sign the Global One document as requested. Additionally, the person signing on behalf of Equitable does not appear to be an authorized officer as required by the Global One document. Here is a portion of that incomplete and unsigned Global One document:



224.    Incomplete and unsigned documents result in confusion regarding exactly what terms are contained within the executed agreement.

225.    Here, it is unclear if the terms in the Global One documents control or the terms in the Equitable documents control. Equitable itself is unclear as to which document controls. Below is a portion of a June 2023 notice sent regarding policy premium refunds totaling approximately $162,737 in which Equitable falsely stated it had acted appropriately and further stated Global One loans regarding Cross-Complainants' policies are legitimate:

Equitable has received a claim from Synovus Bank ("Synovus"), asserting that they were entitled to receive the refunded amount of $162,736.70, which was sent to you to prevent the Policies from becoming Modified Endowment Contracts. Premiums paid by Synovus are a liability you owe to Synovus under your premium finance arrangement. While Equitable acted appropriately, it is writing to put you on notice of the claim by Synovus so that you can take all appropriate steps to ensure that the amount of $162,736.70 is preserved until the claim by Synovus is resolved.

### C.      **Failure to Deal Fairly and in Good Faith**

226.    Insurance Companies must deal openly and honestly with insureds and policy owners. Insurers are required to put the interests of their policyholders ahead of their own and protect them from adverse third parties.

227.    Here, Equitable overlooked significant amounts of suspicious information in various documents related to Cross-Complainants' policies. Additionally, Equitable failed to promptly address requests for assistance from Cross-Complainants concerning their policies and Global One loans, even when time was of the essence. Cooperation from Equitable was further withheld from Cross-Complainants, effectively prioritizing Equitable's interests and those of Global One over Cross-Complainants, despite Pinali Modi expressing concerns during a phone call with Equitable employee Muni Bhambri on June 26, 2023, regarding fraudulent acts concerning Cross-Complainants' policies.

228.    In the end, despite clear warning signs and numerous red flags, Equitable took unreasonable actions against Cross-Complainants in surrendering Cross-Complainants' policies. These failures and adverse actions have led to financial damages incurred by Cross-Complainants.

## IV.    **POLICY SALES MISCONDUCT**

229.    All insurance companies, including Equitable, have a responsibility to (1) supervise all agents appointed with Equitable, (2) ensure all agents follow industry rules,

regulations, standards of care and (3) make certain all agents follow internal policies and procedures.

230. Fraudulent schemes are typically promoted by fraudsters with a documented history of similar behavior. Both Goel and Zois had been investigated for questionable sales practices multiple times, and this information was readily available on public websites administered by various state insurance departments and FINRA. Further, documents show Cross-Defendants had ample opportunity to supervise them and investigate their regulatory history but failed to do so. Equitable knew or should have known, that Goel and Zois were engaged in their scheme to defraud Cross-Complainants using life policies issued by Equitable.

231. Equitable's failures harmed Cross-Complainants by allowing Equitable's agents to circumvent protections and protocols enacted to detect, deter, and prevent the exact type of fraudulent behavior seen here in this scheme. Below are examples encountered in the documents.

### A. **Failure to Supervise**

#### 1. **Prohibited Terms**

232. Procedures and Practices prohibit agent using the term "investment," "investment plan," "interest plan," "savings," "savings plan," "private pension plan," "retirement plan" or other similar terms when referring to a life insurance policy because it misleads and infers an additional benefit beyond just a life insurance policy. Two of the Veludi Spreadsheets Goel provided to Cross-Complainants contained the prohibited terms "investment" and "interest" in their file names. Here is a portion of the email that

Pinali Modi sends to herself with those files:

| From: | Pinali Modi |
|---|---|
| To: | Pinali Modi |
| Subject: | Fwd: Dinesh & Sadhna Patel |
| Date: | Wednesday, July 21, 2021 7:49:16 AM |
| Attachments: | ==Dinesh Patel 250k Interest Financed Investment Account.pdf== |
| | Untitled attachment 39323.htm |
| | ==Sadhna Patel 350k PF Investment Account III.pdf== |
| | Untitled attachment 39326.htm |

### 2.      Misleading Spreadsheets

233.    Procedures and Practices require only approved policy "illustrations" generated by the insurance company to show policy performance scenarios. Illustration outputs are highly regulated, requiring thorough explanations and disclosures to potential policy purchasers.

234.    Here, Goel did not provide Cross-Complainants with approved policy illustrations. In deceiving Cross-Complainants, Goel instead used misleading and non-compliant spreadsheets produced by his company Veludi Capital Strategies (the "Veludi Spreadsheets"). The Veludi Spreadsheets varied by proposed insured and appeared authentic and legitimate. However, the spreadsheets lacked the required disclosures and explanations in illustrations presenting IUL policies and premium financing loans that differed dramatically from what Equitable's agents sold to Cross-Complainants. The following example compares the Veludi Spreadsheet to the Equitable illustration for the policy insuring Dinesh Patel:

| *Policy Insuring Dinesh Patel* | What Veludi Spreadsheet Showed | What Equitable unsigned "as sold" illustration dated 1-4-2021 showed |
|---|---|---|
| Policy Cash Surrender Value End of Year 1 | $196,406 | $22,918 |
| Premium Financing Loan Annual Interest Rate | 3.00% | 3.25% |
| Premium Financing Loan Payoff Date | 10 years after issue | 15 years after issue |
| Payment of Premium Financing Loan Interest | From Annuity Years 1-2, then Borrowed Years 3+ | Paid in cash all years |
| Premium Finance Loan Balance in Year 10 | $2,923,162 | $2,500,000 |
| Estimated Additional Collateral in Year 1 | $0 | $246,937 |
| Estimated Additional Collateral in Year 5 | $0 | $337,749 |

235.   This next example compares the Veludi Spreadsheet to the Equitable

illustration for the policy insuring Pinali Modi.

| *Policy Insuring Pinali Modi* | What Veludi Spreadsheet Showed | What Equitable unsigned "as sold" illustration dated 1-4-2021 showed |
|---|---|---|
| Life Insurance Company Name | Ameritas | Equitable |
| Annual Policy Premium | $200,000 | $200,000 |
| Policy Death Benefit | $8,173,938 | $9,000,000 |
| Policy Cash Surrender Value End of Year 1 | $29,538 | |
| Premium Financing Loan Annual Interest Rate | 3.00% | 3.25% |
| Premium Financing Loan Payoff Date | 15 years after issue | 15 years after issue |
| Payment of Premium Financing Loan Interest | From Annuity Years 1-2, then Borrowed Years 3+ | Paid in cash all years |
| Premium Finance Loan Balance in Year 10 | $2,338,529 | $2,500,000 |
| Estimated Additional Collateral in Year 1 | $0 | $246,937 |
| Estimated Additional Collateral in Year 5 | $0 | $337,749 |

### 3.    Misrepresentations

236.    Equitable's agents made misrepresentations to Cross-Complainants regarding their relationship with Equitable, Cross-Complainants' policies, the F&G annuities, the Global One loans, and other matters.

### a) Licensing and Appointment Status

237.    Insurance agents must be licensed and appointed by an insurance company before they are authorized to transact business on behalf of the insurance company.

238.    Here, Goel represented to Cross-Complainants that he was an agent of Equitable when, in fact, his appointment had terminated months earlier. To conceal this fact, Goel partnered with Zois, his wife, who posed as the agent for Cross-Complainants' policies. Though Equitable appointed Zois, copied her on internal emails, and she signed as the agent on Cross-Complainants' policies, she was used as a diversion.

239.    Goel admitted during an August 2023 Zoom call he was the only "…one who was involved in the case" and that Zois was "really not an active agent…we just had her…get the licensee…" During an October 2023 phone call Goel reiterated Zois "was not involved whatsoever in the transaction."

240.    Documents confirmed his description that Zois was just a cover that allowed him to continue his fraudulent business practices and funnel hundreds of thousands of dollars in commissions to himself and his family.

### b) Free Insurance

241.    In making the false "Free Insurance" misrepresentation, Goel knew that the policy premium representations were false when made with the intent to damage Cross-

Complainants. Goel's Veludi Spreadsheets misled Cross-Complainants to believe the life

insurance policies and annuities would earn a rate far exceeding the premium financing

borrowing costs and promising, in essence, that Cross-Complainants would have free

insurance indefinitely.

242.    In making this false misrepresentation, Goel would structure the premium

financing loans to capitalize interest payments at the outset or submit a request soon after

the Global One loans were finalized to capitalize interest and thus eliminate the out-of-

pocket costs. Here is an example regarding the policy insuring Dinesh Patel:



243.    A second example is found in a document attached to a February 16, 2021,

email regarding the policy insuring Sadhana Patel:

Re: Loan Number 400147 - Sadhana Patel Irrevocable Trust

To Whom it May Concern:

Please accept this Letter of Request to amend my loan with Global One Financial, a Division of Synovus Bank as follows…
- Capitalize Interest
- Revise loan interest rate based on my husband (Dinesh Patel ILIT) and I's combined loan advance

If you have any questions or if there is anything else needed to complete this request let me know.

Thank you,

_Sadhana Patel._
Sadhana Patel, Guarantor

_DINESH Patel_
Dinesh Patel, Trustee

244.    Goel further confirms this false "Free Insurance" misrepresentation in his November 17, 2020, text message to Pinali Modi when he declares, "…you guys are not paying interest."

### c) Global One Loan interest rates

245.    Likewise, when making the false 3% Misrepresentation, Goel knew that the representations were false. Though documents reviewed indicate the interest rate on the four Global One loans varied at inception from 3.00% to 3.50% annually, Goel repeatedly assured Cross-Complainants that after they had purchased Cross-Complainants' policies from Equitable, they could lock their interest rate at 3%.

246.    In making this false 3% Misrepresentation, Goel would first show Cross-Complainants his Veludi Spreadsheet indicating the premium financing loan interest rate was fixed at an annual rate of 3.0% indefinitely. However, finalized Global One loan documents for both Dinesh and Sadhana Patel (which they never saw until this dispute

94

arose) clearly show that the preliminary interest rates were 3.25% and 3.50%, respectively.

247.    Indeed, Goel admitted during the August 2023 Zoom call that the Global One loan interest rates "…were not locked in…"

248.    Goel would respond with his false 3% misrepresentation whenever asked about the Global One loan interest rate. On November 17, 2020 Goel sent a text message to Pinali Modi stating in part: "the interest rate is going to be between 2:75-3:25…it's not fixed but it won't go above 3:25…We always put a cap on the interest rate…So, it won't go below 2:75 and not higher than 3:25%."

249.    Then, on February 16, 2021, Goel texted, "It's 3:25 now and when you guys are added it will be 3%." A few weeks later, on March 11, 2021, Goel texted, "As of now, your parents rate is 3:25…Once you and Tejas are added, it will be 3%." On November 19, 2021, Goel texted, "It's all 3%." when answering a question about the rate on the Global One loans. However, the following month, on December 16, 2021, Goel texted Pinali Modi the rate for "…your loan is 2.7"

250.    When the Global One loan rates quickly jumped to 6.11% in the Fall of 2022, Pinali texted Goel on September 22, 2022, stating, "Hey. I just logged into my Global One account, and it says the interest rate is 6.11%. I thought we were locked at 3%." Goel responded with more assurances.

### d) Tax-Free Benefits

251.    Annuities are not the only asset premium financing lenders accept as collateral. However, annuities pay substantially larger commissions to agents like Goel

95

while imposing excessive costs and other charges on policy owners such as Cross-Complainants. Goel should have made these disclosures to Cross-Complainants. Further, annuities are not tax-free; they are tax-deferred, and it is common knowledge in the insurance industry that assigning or pledging any portion of an annuity as collateral is a taxable distribution under Internal Revenue Code § 72(e). Many insurance companies require a disclosure to be signed regarding this fact. Ignoring this, Goel directed Cross-Complainants to deposit approximately $1,000,000 into three annuities pledged as collateral for the premium financing Global One loans. Requiring Cross-Complainants to collateralize the F&G annuities generated additional income taxes that were excessive, wholly avoidable, and a direct result of Goel's actions.

### e) Global One Loan Collateral Requirements

252.    Equitable's agents should have informed Cross-Complainants that they might have to post additional collateral. That's why Cross-Complainants questioned Goel when they received the first collateral call from Global One in June of 2021. Goel's Veludi Spreadsheet emphasized that Cross-Complainants would only need to post collateral in the form of the F&G annuity because the Global One loan interest rate (see the 3% misrepresentation) would be several percentage points below the rate earned by the annuities and life insurance policies. This false misrepresentation was exposed by additional requests for collateral from Global One beginning in the summer of 2021.

253.    Documents further indicate that, using funds Patel previously provided to Goel for a separate investment, Goel "loaned" Patel's own funds back to Patel to meet many Global One collateral calls. Examples can be found in three text messages. First, in

an October 29, 2021, text message, Goel writes to Pinali Modi regarding having no funds to meet one of the unanticipated collateral calls from Global One: "…no need to worry about the $$...I have it covered…" Second, on November 16, 2021, Goel apologized for Patel's hassles when wiring their funds to meet a Global One collateral call and texted, "That's why I sent it in from my account before." Then, on May 18, 2022, Goel texted to confirm that the Patels received his wire. Presumably, Goel is again sending personal funds to Patel to meet the $39,868 collateral call from Global One.

254.    Policy application documents falsely stated Equitable's agents offered no financial incentives or cash payments to Cross-Complainants. Documents indicate this was not the case. Financial industry regulations prohibited this practice, and industry regulatory disclosure letters indicate Goel has a documented history of similar behavior, permanently barring him from the securities industry.

### f) Private Investments

255.    Documents indicate Goel also persuaded Cross-Complainants to contribute at least another $130,000 to an illiquid investment involving Nilesh Bhai. As stated above, Goel was not a licensed investment advisor and had been permanently from the securities industry. Goel appears to have falsely stated this investment as short-term.

256.    On March 4, 2021, Pinali Modi texted Goel,"…My dad [Dinesh Patel] wanted to know if you invested the $130k." Goel replied that same day, "Yes the 130k is sent /invested." Then, on March 25, 2021, Goel texted Pinali Modi, "Hi, all is well…we should have the funds in the next 3 weeks." However, a few months after the end of March, on July 6, 2022, Goel texted,"…think we should be good in a week to 10 days

max." Then, six months later, on January 18, 2023, Pinali Modi texted Goel, "Make sure you wire the money today as soon as the bank opens and send me the confirmation otherwise my dad said he is going to talk to Nilesh. It's been 2 months since you saying you going to transfer the money." Unfortunately, in mid-November 2021, Goel informed Cross-Complainants that the investment involved works of art produced by Richard Prince and was still illiquid.

### g) Life Settlements

257.    Policy applications, likely submitted by Goel and signed by Zois, contained numerous inconsistencies, including falsities stating no conversations occurred regarding life settlements before the Patel Policies were purchased. However, Goel admits otherwise. During the August 20023 Zoom call, he describes his false "Life Settlement" misrepresentation at approximately the 46:42 mark by stating, "…all these policies are pitched…companies don't like it, but after the loan has paid off, I know some people who have done that [a life settlement transaction] and they've made…decent money for the client..." When asked, "…and was that one of the options that you told her parents?" Goel responds, "I believe so, I believe so." Documents confirm that Goel did explore this option. On January 20, 2023, Goel texted Kumar and Pinali Modi, "Aneesh can you plz follow with life settlements and have them fax over the request…I have included Dinesh ji's daughter pinali in the text…thanks." An earlier email also confirmed that Goel and Kumar explored a life settlement for Dinesh Patel. Here is a portion of the email:



258.    In summary, various documents indicate that Goel repeatedly withheld information from Cross-Complainants but assured them with numerous false misrepresentations. Goel's misdirection concealed relevant facts from Cross-Complainants, inducing them to believe they were in a prudent and appropriate insurance program, which provided them with a perpetual deferred-interest-premium-financing plan securing $26,000,000 of free insurance for their family.

### 4.    Falsifying Documents

259.    Procedures and practices state prohibit agents from signing or allowing clients to sign incomplete or blank forms. Agents are further prevented from modifying, completing, inserting false signatures, or altering, in any way, a document or other form.

#### a) Signing Blank Forms

260.    Goel routinely asked Cross-Complainants for signatures on blank forms via

email and would have the forms notarized after the fact, if necessary. Documents reviewed contained emails requesting signatures on blank forms for annuities, tax forms, loan underwriting forms, and life insurance policy collateral assignment forms.

261.   Further, documents show Cross-Complainants furnished all details to Equitable's agents with no intention to conceal the truth and relied entirely on Equitable's agents to inform Equitable of those actual facts. In signing blank documents, Cross-Complainants were ignorant that false answers were later inserted by Goel and/or Zois, acting as Equitable and Global One's agents, contrary to truthful responses given by Cross-Complainants.

262.   An Equitable Collateral Assignment Form provides a noteworthy example. At approximately 8:55 am on February 22, 2021, Goel texted Pinali Modi with the following message: "Hi Pinali, I'm emailing you an empty form that needs to be signed by your dad. If you could please have that sent back to me at your convenience, I would appreciate it. That's the last thing bank needs to get me the loan docs. Thank you." Goel then emailed her the blank four-page form. Just over one hour later, Pinali Modi sent back a single page with only Dinesh Patel's signature. Here is that page:

263.    However, Global One's documents contain two versions of this single form that Goel had apparently completed, signed, and notarized after obtaining Dinesh Patel's signature. Here are those two pages likely generated from the above single blank form:

**b) Altering**

264.    Numerous documents appear to have been tampered with, and are thus questionable as to their authenticity. It is often easy to detect, as words are blurred, sections are obscured, fonts in one section differ from fonts in other sections, signature lines are of different length, and the like.

265.    A blatant and obvious example can be found in the "Premium Financing Disclosure Form" for the policy insuring Dinesh Patel. The first alteration is found in the signature block for the insured, Dinesh Patel. This signature has been pasted onto the form in such a way that it obscures the words "Accepted by:"

266.    Another alteration appears on the same form, in the signature block for the policy owner, Sadhana Patel. The signature has been pasted in the wrong location, and one can see how the line under the signature is not straight (compare the left and right sections of the line), and the alteration entirely obscures the right end of the line:

267.    Another alteration appears at the bottom section of the same document, where the officer's signature block has a different font than the section directly above it:

268.   These three areas (especially the first one) are obvious, and even the most inexperienced underwriter should detect them. It is inconceivable how anyone could ignore these questionable items and accept the form as genuine, ultimately allowing this application to be approved and the policy issued.

### c) Notary Certificates

269.   Many insurance and lending documents require notarization. During the times relevant to the execution of these documents, to fulfill their duty, a notary must personally meet with the signer to verify proper identification.

270.   Here, Goel and his former employee, Amina Razza, blatantly ignored this requirement. Goel admits to using Amina Razza to notarize documents for Cross-Complainants' policies and the Global One loans because she didn't require Cross-Complainants to be physically present – and Cross-Complainants were not, and weren't even aware that the notarizations were occurring. This is precisely the behavior that notaries are needed and relied upon to prevent.

## V.   PREMIUM FINANCING

### A.   Summary

271.   As discussed above, for the entire scheme to work, the Equitable premiums were to be paid through a "Premium Finance" loan arranged with Cross-Defendant Global One.

272.   For the Global One loans allegedly made in 2020 and 2021, copies of the "completed" loan documents were not timely provided to Cross-Complainants.

273.   The loans were solicited by Cross-Defendants Equitable and/or Global One

in New Jersey through its/their authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation occurred between Cross-Defendants' agent and Cross-Complainants in New Jersey, or unilaterally among Cross-Defendants' agent (Goel and/or Zois) in New York, where the agent (Goel and/or Zois) resided and had an office.

274.    Cross-Defendant Goel represented to Cross-Complainants that he represented Cross-Defendants Equitable and Global One, and Cross-Defendants Equitable and Global One each authorized Cross-Defendant Goel and/or Zois to act as their agent in conducting business on their behalf.

275.    Equitable and Global One jointly presented the life insurance and premium financing as a "package deal." Equitable authorized and approved Cross-Defendants Goel and/or Zois to negotiate, offer, solicit, complete all forms and underwriting documents, obtain Cross-Complainants' required documents and supply them to Cross-Defendants, as well as to participate in the service and administration of Global One's loan and the Equitable Policy. Cross-Defendants offered no alternate lender or loan to Cross-Complainants.

276.    Global One's loan application is called a Trust Borrower Loan Underwriting Form ("LUF"). The LUF does not disclose Global One's legal name, instead listing only the "globalone" name, address, phone number, website, and email address. Cross-Defendants concealed from Cross-Complainants its identity and location in the portion of the loan documents. For example, the LUF lists "GFD" and a logo for "G1" with "globalone" listed below.

277.    Omitted are the license number, legal name, phone number, address, and website. On information and belief, GFD stands for Global Financial Distributors (now known as "Synovus Life Finance"), which is a commission based, life insurance licensed sales organization and NOT a licensed lender. GFD's website states:

> GFD is the nation's leading provider of high-touch, customized life insurance premium financing and insurance-backed lending strategies and is a non-bank licensed insurance agency subsidiary of Synovus Bank. GFD's products and strategies are collectively marketed under the Leveraged Planning® solutions brand.

About Us - Global Financial Distributors (globalfd.com)[4]
https://www.globalfd.com/about-us/

278.    Notably, "Global Financial Distributors, Inc." was a commission-based, life insurer appointed agency/brokerage, and was a life insurance marketing agency. GFD represents that "Global Financial Distributors is a non-bank licensed insurance agency subsidiary of Synovus Bank."[5]

279.    On information and belief, GFD was a licensed and appointed agency of Equitable. GFD either held a New Jersey life insurance producer/agency license, or operated and received commissions in violation of New Jersey Law. GFD was also

---

[4] Downloaded from https://www.globalfd.com/about-us/ (accessed July 1, 2024).

[5] On information and belief, Global One claims to be a lender who just made a loan and is neither aware of nor responsible for complying with life insurance codes or insurer rules. Further, they falsely claim not to be in a joint-venture or common enterprise with insurance companies. This misdirection is also belied by the fact that they have a common/confusing name with GFD and share the identical business address of 1200 Ashwood Parkway, Suite 150, Atlanta, GA 30338. www.globalfd.com. All references to "Global One" in this Petition include GFD.

required to hold a New Jersey license to broker premium financing.

280.   Cross-Complainants did not do business in Georgia nor execute any loan documents with Global One Financial. The loan was solicited in New Jersey through Global One Financial and Global Financial Distributors' authorized agent and all activities relating to the loan solicitation, application, administration and any negotiation (if any) occurred between their agent and Cross-Complainants in New Jersey.

281.   Accordingly, borrowers (including Cross-Complainants) could not know from whom they were borrowing money, and had Cross-Complainants been provided the LUF (which they were not), they would not have known who they were.

282.   Cross-Complainants did not participate in the completion of the LUF.

283.   Global One and Equitable both have significant marketing materials for premium financing explaining the risks, benefits, considerations, and eligibility standards, but none of these documents were provided to plaintiffs. Global One (through GFD) uses these and other marketing materials it created to market the integrated premium financing program. Attached as **Exhibit A** hereto is a true and correct copy of certain relevant GFD Marketing Materials. Cross-Defendant Goel and/or Zois completed all applications and related forms on behalf of Cross-Defendants.

284.   Unbeknownst to Cross-Complainants, the application and related documentation prepared by Cross-Defendant Goel and/or Zois in connection with both the Equitable policy and the Global One premium financing loan were incomplete and were falsified in a number of material ways (which, singularly or collectively should have been a "red flag" triggering further questions from Equitable and/or Global One).

### B.    Premium Financing - Minimum Requirements

285.    When the Equitable policies were applied for, Global One and Equitable's established suitability and eligibility standards required a documented, verified minimum net worth for the borrower of $5 million, that interest be paid (i.e., not capitalized or accrued), and the annual premium borrowed for the planned financed premium should be affordable for the borrower and policyowner indefinitely (through the insured's death). True and correct copies of relevant Global One and Equitable's applicable guidelines for Cross-Complainants are attached as **Exhibits B and C**.

286.    As discussed above, the Equitable applications have numerous fatal issues.

287.    In light of the foregoing, and as demonstrated by the relevant documents, Defendants Global One and Equitable appear to have either performed no underwriting due diligence, or they moved forward in spite of overwhelming evidence that this life insurance was wholly unwarranted, against their own internal policies, and virtually every industry standard.

288.    Each of the trusts involved in this action is an irrevocable trust, whose sole asset was the life insurance; each trusts was an Irrevocable Life Insurance Trust ("ILIT"). Creating an ILIT means that the insured(s) must relinquish control over the trust, and name one or more trustees to manage the trust assets. According to IRC § 2042, the insured must not have any "incidents of ownership" over the life insurance policy. These facts are commonly known to even the most inexperienced life insurance agents.

289.    Global One knew or should have known that the main purpose of an ILIT is to decrease the value of an individual's estate in order to reduce the estate tax paid on life

insurance benefits passed from the grantor to the beneficiary. Moreover, Global One, as a seasoned lender in this space, is or should be aware of the following, from the Official Staff Commentary (issued in 2012) to the Truth In Lending Act ("TILA") (also known as "Regulation Z"):

> Trusts. Credit extended for consumer purposes to certain trusts is considered to be credit extended to a natural person rather than credit extended to an organization. Specifically:
>
> i. Trusts for tax or estate planning purposes. In some instances, a creditor may extend credit for consumer purposes to a trust that a consumer has created for tax or estate planning purposes (or both). Consumers sometimes place their assets in trust, with themselves or themselves and their families or other prospective heirs as beneficiaries, to obtain certain tax benefits and to facilitate the future administration of their estates. During their lifetimes, however, such consumers may continue to use the assets and/or income of such trusts as their property. A creditor extending credit to finance the acquisition of, for example, a consumer's dwelling that is held in such a trust, or to refinance existing debt secured by such a dwelling, may prepare the note, security instrument, and similar loan documents for execution by a trustee, rather than the beneficiaries of the trust. Regardless of the capacity or capacities in which the loan documents are executed, assuming the transaction is primarily for personal, family, or household purposes, the transaction is subject to the regulation because in substance (if not form) consumer credit is being extended.

Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 78 FR 79730-01; See also 12 C.F.R. pt. 1026, Supp. 1, § 1026.3 Comment 3(a)-10.

290.    In light of Global One's understanding and approval of the fact that the loans to Cross-Complainants' ILITs were expressly for the consumer purposes described in the Official Staff Commentary to Regulation Z, Global One knew or should have known that in substance (if not form) these were consumer loans.

291.    Notwithstanding this, Global One improperly characterized the premium

108

finance loans as "commercial" so it could charge fees and interest not otherwise allowed in consumer loans, and to avoid the stringent disclosure requirements coincident with consumer loans.

292.    To be clear, while the Global One loans were supposedly made to the Cross-Complainants' ILITs, in reality and all substance, these were consumer loans. Cross-Complainants had no business or commercial use for the loan proceeds; the loan was obtained to pay for a personal, household, or familial purpose: the premiums for a life insurance policy on the individual Cross-Complainants' lives, where their heirs were the beneficiaries. The policies and attendant premium finance loans were not made in connection with any business activity or valid insurable risk.

293.    On information and belief, not only did Global One fail to provide the required disclosures and underwriting due diligence required for a consumer loan, but Global One was not authorized to issue premium finance consumer loans in the State of New Jersey as and when it issued the premium finance loan described herein, as Global One lacked a premium finance lending license or other required insurance and lending licenses in New Jersey as required to sell the premium financing product herein described.

294.    Global One also improperly accepted and "relied" on documentation Cross-Complainants had never seen or authorized and which were falsified, and appears to have either performed no underwriting due diligence, or else knowingly or willfully disregarded and violated its own internal policies, lending regulations, insurance regulations, and industry standards.

295.    In light of the foregoing, to the extent that any Cross-Complainant borrowed from Global Financial Distributors or Global One Financial, they were fraudulently induced into the contract and deny any claim of jurisdiction other than in New Jersey. Neither the loan nor the insurance documents were presented to Cross-Complainants. Cross-Complainants were unaware of and did not consent to the agreements, purchases, or purported representations made on their behalf to both Equitable or Global One Financial or Global Financial Distributors: There was no meeting of the minds. The loan documents were not provided to the Cross-Complainants before this dispute arose.

296.    To the extent any of the loan documents contain any Cross-Complainant's genuine signatures, such Cross-Complainant was not permitted to read the documents before signing them, nor were they left with any copies.

297.    Global One failed to make the minimum disclosures of loan terms and risks to Cross-Complainants; they failed to disclose necessary and pertinent information regarding the loan as required by law. The interest rate, fees, terms and conditions were not explained or communicated to the Cross-Complainants.

298.    The premium finance contract violates New Jersey lending and insurance laws, as well as federal lending and consumer protection laws. Global One charges unlawful default and other interest, loan origination charges, penalties, and other fees prohibited by law.

299.    Global One did not have a valid security interest in the life insurance since they violate the policy assignment provision – permitting only the policy owner the right

110

to assign, and Global One's assignments do not comply with the requirements of the Uniform Commercial Code ("UCC") or the applicable New Jersey insurance law for creating and perfecting such an interest. The policy owners were always the Trusts (i.e., the "You and Your" as used in the policy). The assignment forms on which Cross-Defendants rely were not signed by the trustees in their capacity as trustees, and listed individuals as the owners.

300. Global One did not have a proper assignment of the policies, a valid power of attorney, or a valid notice of interest filed with Equitable. The policy assignments are therefore invalid and were improperly submitted to Equitable and accepted by Equitable.

C. **Forgeries, Missing Information, and Misrepresentations Regarding Global One's Loans**

301. On December 18, 2020:

m. a "Promissory Note and Security Agreement" in favor of Cross-Defendant Global One was purportedly signed by Cross-Complainant Dinesh Patel as trustee of the Sadhana Patel Irrevocable Trust, as was an accompanying acknowledgement and authorization for direct ACH debits. These documents were never seen by any Cross-Complainant and the signatures are forgeries, or else were signed when Goel simply pointed at pages to be signed.

n. A "Letter of Commitment" for Cross-Defendant Global One's loan to the Sadhana Patel Irrevocable Trust was purportedly signed by Cross-Complainant Dinesh Patel. This document was never seen by any Cross-

Complainant and the signature is a forgery.

o. A "Collateral Assignment of Life Insurance" was purportedly signed by both Cross-Complainant Dinesh Patel on behalf of the Sadhana Patel Irrevocable Trust, and by Cross-Complainant Sadhana Patel, and notarized by Amina Razzaq. The signatures are forgeries, or else were signed when Goel simply pointed at pages to be signed, and the notarization is false.

302. On December 21, 2020, Goel went to the Patel's home and asked them sign a stack of documents. He did not give them time to review the documents, and did not leave them any copies of what they signed.

303. Also on December 21, 2020:

a. a "Guaranty" was purportedly signed by Cross-Complainant Sadhana Patel (as "Guarantor" for the Sadhana Patel Irrevocable Trust) in favor of Cross-Defendant Global One. This document was never shown to Cross-Complainant Sadhana Patel, and is either a forgery, or else was signed when Goel simply pointed at pages for her to sign. Either way, she never saw this document.

b. an "Assignment of Life Insurance Policy as Collateral" was purportedly executed by Cross-Complainant Dinesh Patel, and bears a notarization from "Amina Razzaq," a New York Notary Public, who claimed that it was signed in front of her. This document was never seen by any Cross-Complainant, the signature is a forgery, and the notarization is completely false, or else was signed when Goel simply pointed at pages to sign. Either

112

way, the document was never seen.

304.    On February 2, 2021, Equitable's "Acknowledgement and Disclosure" for PFLI is purportedly signed by Cross-Complainants Dinesh Patel and Sadhana Patel. While Cross-Defendant Zois signs the form for Cross-Defendant Equitable, this form was never presented to nor signed by any Cross-Complainant. Cross-Complainants' signatures on this document are forgeries.

305.    On February 16, 2021, Goel emails the Patels to ask them to sign more documents, including a loan amendment request, claiming that, as a result, the loan interest rate will change: "it's 3.25 now and when you guys are added it will be 3%." Cross-Complainants comply with Goel's request.

306.    On February 22, 2021, Goel emails a blank "Collateral Assignment Form" to Cross-Complainant Pinali Modi, seeking Dinesh Patel's signature. Pinali asks Goel if the form should be filled out, but Goel says to just sign the blank form. No filled-out copy was provided to any Cross-Complainant.

307.    On February 25, 2021:

    a.    a "Promissory Note and Security Agreement" by the Dinesh Patel Irrevocable Trust in favor of Cross-Defendant Global One was purportedly signed by Cross-Complainant Sadhana Patel as trustee of the Dinesh Patel Irrevocable Trust, as was an accompanying acknowledgement. These documents were never seen by any Cross-Complainant and the signatures are forgeries.

    b.    "Amendment No. 1 to Promissory Note and Security Agreement in favor of

Cross-Defendant Global One was purportedly signed by Cross-Complainant Dinesh Patel as trustee of the Sadhana Patel Irrevocable Trust. This document was never seen by any Cross-Complainant (and is a completely different document from the February 16, 2021 "loan amendment request"), and the signature is a forgery.

308. On March 1, 2021:

a. an "Assignment of Life Insurance Policy as Collateral" was purportedly executed by Cross-Complainant Dinesh Patel, and bears a notarization from "Amina Razzaq," a New York Notary Public, who claimed that it was signed in front of her in Kings County, New York. This document was never seen by any Cross-Complainant, the signature is a forgery, and the notarization is completely false.

b. a "Guaranty" was purportedly signed by Cross-Complainant Dinesh Patel (as "Guarantor" for the Dinesh Patel Irrevocable Trust) in favor of Cross-Defendant Global One. This document is a forgery, or else were signed when Goel simply pointed at pages to be signed without her knowing of its contents.

c. an "Assignment of Life Insurance Policy as Collateral" was purportedly executed by Cross-Complainant Sadhana Patel, and bears a notarization from "Amina Razzaq," a New York Notary Public, who claimed that it was signed in front of her in Kings County, New York. This document was never seen by any Cross-Complainant, the signature is a forgery, or else

were signed when Goel simply pointed at pages to be signed, and the notarization is completely false.

309.   On March 9, 2021, Cross-Complainant Pinali Modi emailed Goel to ask (again) if more money would be needed for anything. Goel telephoned her in response, telling her that it would not, as the combined collateral covered it.

310.   On March 11, 2021, Goel writes that interest is being taken out of the Patel's account, which he said would be financed once all four policies were in place. At this time, he again confirms that while interest is 3.25%, once the Patels' policies are added, it will go down to 3%. Moreover, he states that he is working with the bank on a refund for the interest.

311.   On March 12, 2021, Cross-Complainant Pinali Modi asks Goel to see what he put on the blank applications they'd signed. Goel said he would, but he never sent anything.

312.   On March 19, 2021:

    a. The "Pinali Modi Irrevocable Trust Dated March 19, 2021" was created for the purpose of owning life insurance, with Tejas Modi and Sadhana Patel as Trustees. The Grantor and Trustee signatures on this document were all actually notarized by a New Jersey notary.

    b. The "Tejas Modi Irrevocable Trust Dated March 19, 2021" was created for the purpose of owning life insurance, with Pinali Modi and Sadhana Patel as Trustees. The Grantor and Trustee signatures on this document were all actually notarized by a New Jersey notary.

c.  Of note, since Cross-Complainants had a notary in NJ, they had no need to use a notary in New York, underscoring that the New York notarizations were all false.

313.  On March 22, 2021, Goel emails Cross-Complainant Pinali Modi, asking her and Cross-Complainant Tejas Modi to each sign blank Global One trust borrower loan underwriting forms and blank Global One Certifications of Trust.

314.  On April 27, 2021, Cross-Complainant Pinali Modi again asks Goel to see what he put on the blank applications they'd signed. Goel again said he would, but he never sent anything.

315.  Only a few months later, Cross-Complainants began receiving "Additional Collateral Due" notices from Global One. They asked Goel about them, but he told them not to worry, and he'd take care of everything.

316.  Goel convinced Cross-Complainants to send an additional $63,000 to Global One, but assured them it was temporary, and they'd get the money back in December.

317.  Over the course of numerous communications through September and October of 2021, Goel repeatedly assured Cross-Complainants that he was working with the bank, and that a new notice letter showing no additional collateral was required was imminent.

318.  On or about November 12, 2021, after convincing Cross-Complainants to wire money to Global One, he continues to state that it will be worked out with the bank, caused by a "glitch" in their system.

319.    On January 4, 2022, Cross-Complainants text Goel for an update on the return of the $63,000.

320.    On February 17, 2022, Global One made a $250,000 premium payment to Equitable, and on March 4, 2022, $69,379.23 of that amount was refunded to Cross-Complainants. Believing this to be the promised refund, it was deposited by Cross-Complainant Dinesh Patel.

321.    Trouble began again in September of 2022, when new collateral due notices were sent by Global One. Goel again claimed it would all be resolved, and that he is speaking with James McBrayer, the COO of Global One, about the issue.

322.    Goel has Cross-Complainants cover the shortfall, again assuring them it will be resolved.

323.    On December 8, 2022, an Equitable premium of $350,000 is paid by Global One. On December 23, 2022, $93,357.46 is refunded by Equitable. As previously done, believing this to be a promised refund, it was deposited by Cross-Complainant Dinesh Patel.

## VI.    GENERAL ALLEGATIONS REGARDING THE COMMON SCHEME

324.    In at least the manner listed above, the applications and related documentation contained falsified, fabricated, and misleading information related to the need for such coverage or loan; the applicants' financial wherewithal, identification of income, assets, and ability to pay premiums, and/or finance charges.

325.    On information and belief, no Cross-Defendant performed even the slightest required due diligence in connection with Goel and/or Zois' agent appointment,

117

the life insurance policies and/or premium finance loan, and disregarded and failed to follow their own rules, guidelines, policies, and procedures related to solicitation, application, underwriting, financing, and servicing of the policies and/or premium finance loans at issue in this matter.

326.   Equitable's own applications, illustrations, and policy documents are fatally incomplete, contain untruthful information, forged signatures, and improper and fictional representations by unauthorized and fraudulent co-conspirators.

327.   Global One's own applications, illustrations, and loan documents are fatally incomplete, contain untruthful information, forged signatures, and/or improper and fictional representations by unauthorized and fraudulent co-conspirators.

328.   Of particular note: The entity Cross-Defendants chose to communicate almost exclusively with Cross-Defendant Goel. Indeed, notwithstanding that many documents "appear" addressed to Cross-Complainants, they were not actually sent to them, but were instead sent *only* to Cross-Defendant Goel.

329.   Moreover, Cross-Defendants (directly and/or through their agents Goel and/or Zois) had actual knowledge of each breach and/or wrong (as alleged herein) and recklessly, knowingly, and/or deceitfully concealed the relevant facts such that they remained silent when such Cross-Defendant (directly and/or through their agents Goel and/or Zois) had a duty to speak and/or made a misrepresentation that concealed the wrong. Cross-Complainants relied on these statements and omissions, and as a result delayed bringing their claims, and a result thereof, the relevant statute(s) of limitation are tolled by application of the discovery rule.

330.   Cross-Defendants' actions (and inactions) are in violation of numerous applicable New Jersey Administrative Code sections, including:

a. N.J. Admin. Code § 11:4-52.3 - Policies to be illustrated

b. N.J. Admin. Code § 11:4-52.4 - General rules and prohibitions illustrations

c. N.J. Admin. Code § 11:4-52.5 - Standards for basic illustrations

d. N.J. Admin. Code § 11:4-52.6 - Standards for supplemental illustrations

e. N.J. Admin. Code § 11:4-52.7 - Delivery of illustration and record retention

f. N.J. Admin. Code § 11:17A-4.6 - Delivery of policies

g. N.J. Admin. Code § 11:4-11.3 – Duties of insurers

## VII.   <u>CROSS-COMPLAINANTS SUFFERED EMOTIONAL DISTRESS</u>

331.   Cross-Complainants have suffered loss of sleep, shame, worry, upset, humiliation, anxiety, and ruminating thoughts resulting from their realizing they were betrayed and defrauded by Cross-Defendants, and by the despicable treatment of them by Cross-Defendants.

332.   The stress of these events has taken an especially heavy toll on Dinesh Patel. In the Spring of 2023, Pinali Modi sent two notable text messages to Goel. First, on March 22, 2023, Pinali Modi texted Goel:

> Can you PLEASE call my parents. They call me everyday asking the same questions which I don't have answers to. This whole thing has made my life a living hell. All they talk about is this sh*t, and I'm tired of it. They want to hear it from your mouth what is going on. They don't know why u don't want to talk to them or answer their calls or text messages. Please call them ASAP.

333.   Then, on June 5, 2023, Pinali sent a second text message to Goel:

My dad is very depressed and is having suicidal thoughts every day as a result of this. This is all he talks about all day and can't sleep at night for months on end now. My mom said she doesn't what to loose [sic] him and doesn't want to draw this out any longer. Until he gets all his money back that is all he is ever going to think about so once he gets this then he's going to be after me every day for the E&O funds and the other money you owe.

334.    Cross-Complainants relied on Equitable and Global One's policies to build wealth, make their lives easier, and enhance the security of their finances. However, the opposite occurred. Cross-Defendants knew that financial misrepresentations were made in applications for Cross-Complainants' policies to obtain higher-face-value policies with higher commissions. As a direct result, Cross-Complainants have lost money, been coerced into unsuitable financial products, dealt with continuous financial pressures from unexpected collateral calls, and been forced to handle unexpected tax bills.

## CAUSES OF ACTION

### Count One - Breach of Contract
### (Against Equitable and Global One)

335.    Cross-Complainants incorporate by reference the preceding paragraphs 1-332 of the "COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS" as though fully set forth herein.

336.    For the reasons set forth above, Cross-Complainants do not believe that any enforceable contracts exist as between any Cross-Complainant and any Cross-Defendant.

337.    However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), each Cross-Complainant did what the relevant contract required the Cross-Complainant to do, or such Cross-

120

Complainant was excused from performance under the relevant contract.

338.    As described above, Cross-Defendants Equitable and/or Global One did not do what the contracts required each of them to do.

339.    Cross-Defendants Equitable and/or Global One's breach, or failure to do what the contracts required, caused a significant loss to each Cross-Complainant.

### Count Two - Breach of the Covenant of Good Faith and Fair Dealing (Against Equitable and Global One)

340.    Cross-Complainants incorporate by reference the preceding paragraphs 1-337 of the "COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS" as though fully set forth herein.

341.    For the reasons set forth above, Cross-Complainants do not believe that any enforceable contracts exist as between any Cross-Complainant and any Cross-Defendant.

342.    However, to the extent any such contract(s) were entered into and are found to be enforceable (e.g., not illegal or fraudulently induced), Cross-Defendants Equitable and/or Global One breached the implied covenant of good faith and fair dealing as to each Cross-Complainant.

343.    A party must not act in bad faith, dishonestly, or with improper motive to destroy or injure the right of the other party to receive the benefits or reasonable expectations of the contract.

344.    As explained above, Cross-Defendants Equitable and/or Global One (directly or through their agents) acted in bad faith, dishonestly, or with improper motive.

345.    Cross-Complainants were damaged by Cross-Defendants Equitable and/or

Global One's breaches of the covenant of good faith and fair dealing in an amount to be determined at trial.

### Count Three - Negligence/Negligent Misrepresentation/Gross Negligence (Against All Cross-Defendants)

346.    Cross-Complainants incorporate by reference the preceding paragraphs 1-344 of the "COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS" as though fully set forth herein.

347.    Cross-Defendants Equitable and/or Global One (directly or through their agents) owed a duty of care to each Cross-Complainant.

348.    For the reasons alleged hereinabove, Cross-Defendants Equitable and/or Global One (directly or through their agents) breached that duty of care to each Cross-Complainant.

349.    The breaches by Cross-Defendants Equitable and/or Global One (directly or through their agents) were the proximate cause of injury to each Cross-Complainant.

350.    In doing the acts (or failing to act) as alleged hereinabove, Cross-Defendants acted with Gross Negligence, because each Cross-Defendant's actions or failures to act created an unreasonable risk of harm to the Cross-Complainants because of each Cross-Defendants' failure to exercise slight care or diligence.

351.    As alleged hereinabove, Cross-Defendants Equitable and/or Global One (directly or through their agents) negligently misrepresented the material terms of the policies of insurance and the premium loans, Cross-Complainants justifiably relied upon those misrepresentations, and were each injured as a consequence of that reliance.

## Count Four - Fraud
### (Against All Cross-Defendants)

352.    Cross-Complainants incorporate by reference the preceding paragraphs 1-350 of the "COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS" as though fully set forth herein.

353.    As alleged hereinabove, Cross-Defendants Equitable and/or Global One (directly or through their agents Goel and Zois), and Cross-Defendants Goel and Zois each defrauded each Cross-Complainant.

354.    As alleged hereinabove, each Cross-Defendant made material misrepresentations of presently existing or past facts, with the knowledge or belief by such Cross-Defendant of their falsity, and with the intention that each Cross-Complainant rely on the misrepresentations. Each Cross-Complainant reasonably relied thereon, and each was damaged as a result.

## Count Five – Fraudulent Inducement
### (Against All Cross-Defendants)

355.    Cross-Complainants incorporate by reference the preceding paragraphs 1-353 of the "COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS" as though fully set forth herein.

356.    As alleged hereinabove, Cross-Defendants Equitable and/or Global One (directly or through their agents Goel and Zois), and Cross-Defendants Goel and Zois fraudulently induced Cross-Complainants to part with their money in connection with the PFLI scheme.

123

357.    Each Cross-Defendant (directly or through their agents): (1) made material representation(s) of a presently existing or past fact; (2) made with knowledge of its/their falsity; and (3) with the intention that Cross-Complainants rely thereon; (4) resulting in reliance by Cross-Complainants; (5) to each Cross-Complainant's detriment.

358.    Among other things, Cross-Complainants were fraudulently induced into entering the contracts. Where, as here, a party was tricked, pressured, or misled into agreeing to the terms of a contract, the contract may be deemed invalid; a contract based on fraud, misrepresentation, and illegal inducement is voidable as there was never a true meeting of the minds.

### Count Six - Conversion
### (Against All Cross-Defendants)

359.    Cross-Complainants incorporate by reference the preceding paragraphs 1-357 of the "COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS" as though fully set forth herein.

360.    Under applicable law, conversion is the exercise of any act of dominion in denial of another's title to chattels, or inconsistent with such title. More loosely, conversion is, essentially, a civil remedy for theft, for unlawful taking, or for unlawful keeping.

361.    As alleged hereinabove, Cross-Defendant Equitable unlawfully converted Cross-Complainants' policy cash values in direct violation of the policies. As stated at page 12 in each of the policies:

124

In this policy:

"We," "our" and "us" mean Equitable Financial Life Insurance Company.
"You" and "your" mean the owner of this policy.

362. Each time Cross-Defendant Global One obtained money for a so-called "collateral call" from Cross-Complainants, Cross-Defendant Global One unlawfully converted those amounts, as they had no actual right to those amounts, as they had no enforceable contract with any Cross-Complainant.

363. Cross-Defendants Goel and Zois were paid commissions for placing the insurance and/or loans with Cross-Defendants Equitable and/or Global One. Those commissions are funds unlawfully converted from Cross-Complainants, as neither Cross-Defendants Equitable and/or Global One had any enforceable contracts with any Cross-Complainant.

**Count Seven – Violation of the New Jersey Consumer Fraud Act**
**(Against All Defendants)**

364. Cross-Complainants incorporate by reference the preceding paragraphs 1-

125

362 of the "COUNTERCLAIMS, CROSS CLAIMS, AND JOINED CLAIMS" as though fully set forth herein.

365.    Cross-Defendants violated the New Jersey Consumer Fraud Act ("NJCFA"), which makes it unlawful for any person to:

> use or employ[] ... any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation," or to "knowing[ly] conceal[], suppress[], or omi[t] ... any material fact with intent that others rely upon ... [that] concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…

NJCFA § 2, N.J.S.A. § 56:8-2.

366.    As alleged hereinabove: (1) Cross-Defendants each committed an unlawful practice; (2) Cross-Complainants suffered an ascertainable loss as result of the unlawful act; and (3) a causal relationship exists between the unlawful practice and the loss.

367.    As defined by the NJCFA, an "unlawful practice," is the:

> act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate.

N.J.S.A. 56:8-2.

368.    As alleged hereinabove, each Cross-Defendant engaged in unlawful practices pursuant to the NJCFA.

369.    The loan agreements are unenforceable because they are procedurally and substantively unconscionable. The terms of the agreements are so one-sided and unfair

126

that they shock the conscience and should not be enforced, including the prohibited pre-dispute waiver of jury (in violation of Georgia law); the requirement for a confession to judgment that would deprive Cross-Complainants of their ability to defend against the personal guarantee; and the imposition of pre-payment penalties on the entire potential line of credit even if not used.

370.   The Global One contracts violate Georgia and New Jersey lending and insurance laws, as well as federal lending and consumer protection laws. Cross-Defendant Global One charges unlawful interest, loan origination charges, penalties, and other fees prohibited by law.

371.   Cross-Defendants have also violated provisions of the applicable Insurance Code, thereby invalidating the contracts.

372.   Cross-Defendant Global One did not have a valid security interest in the life insurance policies since they violate the policy assignment provision – permitting only the policy owner the right to assign, and Cross-Defendant Global One's assignments do not comply with the requirements of the Uniform Commercial Code (UCC) or the Insurance Law for creating and perfecting such an interest. Cross-Defendant Global One did not have a proper assignment of the policies, a valid power of attorney, or a valid notice of interest filed with the insurance companies.

373.   Cross-Defendant Global One lacked a premium finance lending license or other applicable required insurance and lending licenses in New Jersey as required.

374.   Cross-Defendant Global One failed to make the minimum disclosures of loan terms and risks to Cross-Complainants, in that Cross-Defendant Global One failed to

127

disclose necessary and pertinent information regarding the loan as required by law, thereby nullifying any claims against the Cross-Complainants.

375.    Moreover, § 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts or practices in or affecting commerce. Misrepresentations, or omissions of material fact necessary to prevent misleading consumers, constitute deceptive acts or practices pursuant to § 5(a) of the FTC Act.

376.    Further, the NJCFA provides a private right of action in relation to the sale of insurance policies. As such, each of the allegations regarding the unlawful sale of insurance policies herein at issue also form the basis for this Count Seven.

## PRAYER FOR RELIEF

377.    WHEREFORE, Cross-Complainants respectfully pray for the following relief:

a.    That the Court enter judgment in favor of Cross-Complainants on all of the counterclaims, cross-claims, and joined claims;

b.    An award of damages against Cross-Defendants, jointly and severally, of all amounts actually provided to them by Cross-Complainants, plus interest;

c.    An award of general and special damages against Cross-Defendants, jointly and severally;

d.    An award of punitive damages;

e.    An award of attorney's fees if allowed by statute and/or contract;

f.    Under Count Seven, for violation of the New Jersey Consumer Fraud Act, an award of treble damages and attorney's fees;

128

g. That Cross-Complainants recover such other and further relief as the Court

may deem just and proper.

## **JURY TRIAL DEMAND**

Cross-Complainants respectfully request a Jury Trial on all issues so triable.


Respectfully submitted this 23rd day of September, 2024.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP


/s/ *Andrew B. Holmes*_____
Andrew B. Holmes
CA Bar No. 185401
811 Wilshire Blvd., Ste. 1460
Los Angeles, CA 90017
Tel:    213-985-2265
Fax:    213-973-6282
abholmes@holmesathey.com
*(admitted pro hac vice)*

*Attorneys for Defendants and Cross-Complainants:*
Tejas Modi, *individually and as Trustee of the Pinali Modi Irrevocable Trust,*
Pinali Modi*, individually and as Trustee of the Tejas Modi Irrevocable Trust,*
Dinesh Patel, *individually and as Trustee of the Sadhana Patel Irrevocable Trust, and*
Sadhana Patel, *individually and as Trustee of the Dinesh Patel Irrevocable Trust*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been electronically filed with the Clerk of the Court for the United States District Court for the Middle District of Georgia using the CM/ECF system, which will send notification of such filing to counsel of record for all parties in this case.

This 23rd day of September, 2024.

/s/ *Andrew B. Holmes*
Andrew B. Holmes
CA Bar No. 185401
811 Wilshire Blvd., Ste. 1460
Los Angeles, CA 90017
Tel:    213-985-2265
Fax:    213-973-6282
abholmes@holmesathey.com
*(admitted pro hac vice)*

*Attorneys for Defendants and Cross-Complainants:*
Tejas Modi, *individually and as Trustee of the Pinali Modi Irrevocable Trust,*
Pinali Modi*, individually and as Trustee of the Tejas Modi Irrevocable Trust,*
Dinesh Patel, *individually and as Trustee of the Sadhana Patel Irrevocable Trust, and*
Sadhana Patel, *individually and as Trustee of the Dinesh Patel Irrevocable Trust*